FARMERS' LOAN & TRUST CO. *v.* CHICAGO, P. &. S. RY. Co. *et. al.*

*(Circuit Court, W. D. Wisconsin.*   July 10, 1889.)

1. RAILROAD COMPANIES—LAND GRANTS—FORFEITURE.

The state of Wisconsin granted lands to the Chicago, **P. & S.** Railway Company upon the express condition that its road should be completed and in operation by May 9, 1882, and that it should construct 20 miles of road per year on another part of its line.   By act Feb. 16, 1882, the legislature declared the grant forfeited for failure to perform the condition, and granted the lands to the Chicago, St. P., M. & O. Company.   By act March 7, 1883, the Portage Company's road being still incompleted, the legislature confirmed the revocation and resumption of the grant attempted by the act of 1882.   *Held* that, assuming that the act of 1882 was unconstitutional and void, and that its effect was to destroy the credit of the Portage Company, it did not render legally impossible the completion of the road within the prescribed time, no direct interference by the authorized agent of the state being shown.

2. SAME.

The revocation in the act of March 7, 1883, of the grant to the Portage Company, and the confirmation in the same act of the grant to the Omaha Company, were equivalent to a revocation made for the first time on that day, and to an affirmative grant, at the same time, to the Omaha Company, and the validity of that act was not affected by the invalidity of the former act.

3. SAME—INFLUENCING LEGISLATURE.

The validity of the act of the legislature in declaring the forfeiture cannot be affected by the fact that it was influenced or misled by false representations made to its members by the Omaha Company respecting the intentions, financial condition, etc., of the Portage Company.   The judiciary cannot in this manner interfere with the legislative department.

4. SAME.

An adjudication as to rights acquired by individuals under public enactments, based upon an inquiry as to whether those individuals made false representations to the legislature, or as to whether the legislature was probably influenced by such representations, is an indirect interference with the power of the legislature. acting within the limits of its authority, to enact such laws as it deems best for the general good.   The courts must, of necessity, presume (whatever may be averred to the contrary) that no general statute is ever passed either for want of information upon the part of the legislature or because it was misled by the false representation of lobbyists or interested parties.

5. SAME—CONSTITUTIONAL LAW.

Legislative enactments relating to public objects, so far as they confer rights upon individuals. must stand, if they be constitutional, without any attempt upon the part of the courts to conjecture or ascertain what the members of the legislature would or would not have done under any given state of facts established by extrinsic evidence.

6. SAME—PERFORMANCE OF CONDITION BY ANOTHER.

The facts that in January, 1882, the Omaha Company became the principal creditor and owner of all the stock of the Portage Company, and that during that year it built its own road. in its own behalf, parallel to and only a few yards from the half-graded line of the Portage Company, for the required distance, do not entitle the latter company to invoke the principle that where a condition is performed by a person interested it is at an end.

In Equity.   On final hearing.

The Farmers' Loan & Trust Company, a New York corporation, brings this suit in its capacity as trustee in a mortgage or deed of trust, executed January 1, 1881, by the Chicago, Portage & Superior Railway Company, a corporation of Illinois and Wisconsin, having power to construct and equip a railroad from the city of Chicago to a point on the

north line of the former state, at or near the village of Genoa, Wis., thence by the way of Portage to Superior, at the west end of Lake Superior. The object of the mortgage was to secure the payment of the principal and interest of negotiable bonds which the railway company proposed to issue, to the amount of $10,200,000, and to that end it conveyed to the plaintiff, as trustee, its entire road, together with all lands, land grants, franchises, privileges, powers, rights, estate, title, interest, and property belonging or appertaining thereto, including a certain grant of lands made by the United States to the state of Wisconsin, and by the latter to the mortgagor company. The mortgage authorized the trustee, upon default in the payment of interest, to enter upon the premises, and also, in certain contingencies, to sell the mortgaged property. It provided, among other things, that the right of action under it shall be vested exclusively in the plaintiff and its successors in trust, and that under no circumstances should individual bondholders institute a suit, action, or other proceeding, on or under the mortgage, for the purpose of enforcing any remedy therein provided. The bill shows that bonds to the amount of $5,000,000 were executed, and a part of them issued and sold; and that, in respect to the latter, the mortgagor company (which will be called the "Portage Company") was in default as to interest. It is alleged that the defendant the Chicago, St. Paul, Minneapolis & Omaha Railway Company (which will be called the "Omaha Company") wrongfully claims to be the owner of the lands granted by the state to the Portage Company, such claim being founded upon enactments of the legislature of Wisconsin which, the plaintiff avers, are unconstitutional, null, and void. It is also alleged that, even if said enactments vested the legal title in the Omaha Company, the latter, for reasons to be hereafter stated, ought not to be permitted by a court of equity to hold the lands or their proceeds against the plaintiff and the creditors of the Portage Company. A decree is asked declaring this mortgage or deed of trust to be a first lien on the lands, including such as had been or might be certified to the state by the United States as indemnity lands under the above grant. In connection with this general outline of the present suit, it is necessary to state the history of these lands as disclosed by the legislation of congress and of this state. By an act of congress approved June 3, 1856, there was granted to Wisconsin, for the purpose of aiding in the construction of a railroad from Madison, or Columbus, by the way of Portage City, to the St. Croix river or lake, between townships 25 and 31, and from thence to the west end of Lake Superior, and to Bayfield, and also from Fond du Lac, on Lake Winnebago, northerly to the state line, every alternate section of land designated by odd numbers, for 6 sections in width, within 15 miles on each side of said road, respectively; the lands to be held by the state, subject to the disposal of the legislature, for no other purpose than the construction of the road for which they were granted or selected, and disposed of only as the work progressed. The fourth section provided that the lands be disposed of by the state only in manner following,—that is to say, that a quantity not exceeding 120 sections, and included within a continuous

length of 20 miles of the roads, respectively, might be sold; and when the governor certified to the secretary of the interior that any 20 continuous miles of either road were completed, then another like quantity of the land granted might be sold; and so, from time to time, until the roads were completed, and, if they "are not completed within ten years, no further sales shall be made, and the land unsold shall revert to the United States." 11 St. 20. By an act of the Wisconsin legislature, approved October 8, 1856, the lands, rights, powers, and privileges granted by congress were accepted upon the terms, conditions, and reservations contained in the act of June 3, 1856, and the state assumed the execution of the trust thereby created. Laws Wis. 1856, p. 137. On the 2d of March, 1858, the state filed in the general land-office of the United States a map fixing the definite location of the railway under the act of congress of June 3, 1856. By an act approved May 5, 1864, congress enlarged the grant of lands in aid of the construction of a road running northerly from the St. Croix river or lake. The first section of that act granted to Wisconsin for the purpose of aiding in the construction of a railroad from a point on that river or lake, between townships 25 and 31, to the west end of Lake Superior, and from some point on the line of the railroad, to be selected by the state, to Bayfield, every alternate section of public land designated by odd numbers, for 10 sections in width, within 20 miles on each side of said road, deducting lands granted for the same purpose by the act of congress of June 3, 1856, upon the same terms and conditions as are contained in that act; the state to have the right of selecting other lands, nearest to the tier of sections above specified, in lieu of such of those granted as should appear, when the line or route of the road was definitely fixed, to have been sold, or otherwise appropriated, or to which the right of pre-emption or homestead had attached; which lands "shall be held by said state for the use and purpose aforesaid." The time limited for the completion of the roads, specified in the act of June 3, 1856, was extended to a period of five years from and after the passage of the act of 1864. Section 5. The seventh section is in these words:

"That whenever the companies to which this grant is made, or to which the same may be transferred, shall have completed twenty consecutive miles of any portion of said railroads, supplied with all necessary drains, culverts, viaducts, crossings, sidings, bridges, turn-outs, watering-places, depots, equipments, furniture, and all other appurtenances of a first-class railroad, patents shall issue conveying the right and title to said lands to the said company entitled thereto, on each side of the road, so far as the same is completed, and coterminous with said completed section, not exceeding the amount aforesaid, and patents shall in like manner issue as each twenty miles of said road is completed: provided, however, that no patents shall issue for any of said lands unless there shall be presented to the secretary of the interior a statement, verified on oath or affirmation by the president of said company, and certified by the governor of the state of Wisconsin, that such twenty miles have been completed in the manner required by this act, and setting forth with certainty the points where such twenty miles begin and where the same end; which oath shall be taken before a judge of a court of record of the United States."

The eighth section provided that the lands granted should, when patented as provided in section 7, be subject to the disposal of the compa-

nies respectively entitled thereto, for the purposes aforesaid, and no other, and that the railroads be and remain public highways for the use of the government of the United States, free from charge for the transportation of its property or troops.    13 St. 66.    By a joint resolution of its legislature, approved March 20, 1865, the state accepted the grant made by the act of May 5, 1864, subject to the conditions prescribed by congress, (Gen. Laws Wis. 1865, p. 689,) and on the 6th day of May, 1865, filed in the general land-office of the United States a certificate adopting the location on the map previously filed as the definite location under the last act.    That map and location were accepted and approved by the secretary of the interior.    A subsequent act of the legislature, approved March 4, 1874, and published March 11, 1874, c. 126, (Laws Wis. 1874, p. 186,) granted to the North Wisconsin Railway Company, for the purpose of enabling it to complete the railroad then partially constructed by it, all the right, title, and interest the state then had or might thereafter acquire in and to the lands granted by the acts of congress to aid in the construction of a railroad from the St. Croix river or lake, between townships 25 and 31, to the west end of Lake Superior and Bayfield, "except those herein granted to the Chicago & Northern Pacific Air-line Railway Company."    The eighth, ninth, twelfth, and fifteenth sections of that act are as follows:

"Sec. 8. There is hereby granted to the Chicago & Northern Pacific Air-Line Railway Company all the right, title, and interest which the state of Wisconsin now has, or may hereafter acquire, in or to that portion of the lands granted to said state by said two acts of congress as is or can be made applicable to the construction of that part of the railway of said company lying between the point of intersection of the branches of said grants, as fixed by the surveys and maps on file in the land-office at Washington, and the west end of Lake Superior.    This grant is made upon the express condition that said company shall construct, complete, and put in operation that part of its said railway above mentioned as soon as a railway shall be constructed and put in operation from the city of Hudson to said point of intersection, and within five years from its acceptance of said lands, as herein provided, and shall also construct and put in operation the railway of said company from Genoa northerly, at the rate of twenty miles per year.    Sec. 9. The governor is hereby authorized and directed, upon the presentation to him of satisfactory proof that twenty continuous miles of that part of the railway of said company first above mentioned have been completed in accordance with said acts of congress and this act, to issue and deliver, or cause to be issued and delivered, to said company patents in due form from said state for two hundred sections of said land, and thereafter, upon the completion of twenty continuous miles of said railway, he shall issue, or cause to be issued and delivered, to said company, patents for two hundred sections of said lands, and on the completion of that part of the railway of said company lying between said point of intersection and the west end of Lake Superior he shall issue and deliver, or cause to be issued and delivered, to said company patents for the residue of said lands hereby granted to said company."    "Sec. 12. The said Chicago & Northern Pacific Air-Line Railway Company shall, within sixty days from and after the passage of this act, file with the secretary of state a resolution duly adopted by the board of directors, accepting this grant upon the terms and conditions herein contained, and shall also, within said sixty days, give to the state of Wisconsin such security for the completion of

that portion of its railway lying between said point of intersection and the west end of Lake Superior, in accordance with the provisions of said acts of congress and this act, as shall be required by the governor: provided, however, that said security shall be of no force or effect until congress shall have passed an act renewing said grants or extending the time for the construction of said road, or until it shall have been decided by the supreme court of the United States that the present title of the state is absolute and indefeasible; and upon the failure of said company to file said resolution, and to give the said security within the time hereinbefore limited, this act shall be of no effect so far as it grants to said company any interest in or right to said lands." "Sec. 15. This act shall take effect and be in force from and after its passage and publication."

The bond required by the twelfth section of the above act was approved by the governor and filed May 9, 1874. Prior to March 16, 1878, the Chicago & Northern Pacific Air-line Railway Company changed its name to that of the Chicago, Portage & Superior Railway Company. By an act of the Wisconsin legislature, approved on the day last named, and published March 28, 1878, the time limited by the act of March 4, 1874, for the construction and completion of the railway of the Chicago, Portage & Superior Railway Company, was extended three years. Laws Wis. 1878, p. 442. By the first section of an act of the legislature, approved February 16, 1882, c. 10, (Laws Wis. 1882, p. 11,) it was declared that the grant of lands made to the Chicago, Portage & Superior Railway Company by the act of March 4, 1874, "is hereby revoked and annulled, and said lands are hereby resumed by the state of Wisconsin." The second section is in these words:

"There is hereby granted to the Chicago, Saint Paul, Minneapolis & Omaha Railway Company all the right, title, and interest which the state of Wisconsin now has, or may hereafter acquire, in and to the lands granted to said state by acts of congress, approved June 3, 1856, and May 5, 1864, to aid in the construction of a railroad from the Saint Croix river or lake to the west end of Lake Superior and Bayfield, which are applicable under said acts of congress to the construction of that portion of said railroad, from the Saint Croix river or lake to the west end of Lake Superior, which lies between the point of intersection of said last-named railroad by the Bayfield branch, as fixed by the surveys and maps of said railroad and the branch on file in the general land-office in Washington, and the west end of Lake Superior. This grant is upon the express condition that the said Chicago, St. Paul, Minneapolis & Omaha Railway Company shall continuously proceed with the construction of the railroad now in part constructed by it between said point of intersection and the west end of Lake Superior, and shall complete the same so as to admit of the running of trains thereover on or before the 1st day of December, A. D. 1882."

The seventh section provides that "sections 8, 9, and 10 of said chapter 126 of the Laws of 1874, and all acts and parts of acts in any manner contravening or conflicting with the provisions of this act, are hereby repealed." By an act of the Wisconsin legislature, approved March 5, and published March 7, 1883, it was declared:

"Section 1. The revocation, annulment, and resumption made by section 1 of chapter 10 of the Laws of Wisconsin for the year 1882, of the land grant mentioned in said section, are hereby fully in all things confirmed. Sec. 2.

The grant of land made by said chapter 10 of the Laws of 1882, to the Chicago, St. Paul, Minneapolis & Omaha Railway Company, is hereby in all respects fully confirmed. Sec. 3. All acts and parts of acts interfering or in any manner conflicting with the provisions of this act are hereby repealed. Sec. 4. This act shall take effect and be enforced from and after its passage and publication."

*Turner, Lee & McClure* and *Ewing & Southard*, for complainant.
*C. M. Osborn* and *S. U. Pinney*, for defendants.

Mr. Justice HARLAN, after stating the facts in the foregoing language, delivered the opinion of the court.

It will be seen from the above statement that the grant in the eighth section of the act of the Wisconsin legislature of March 4, 1874, embraced so much of the lands granted by the acts of congress of June 3, 1856, and May 5, 1864, as were applicable to the construction of the part of the road of the Portage Company "lying between the point of intersection of the branches of said grants, as fixed by the surveys and maps on file in the land-office at Washington, and the west end of Lake Superior," a distance of about 65 miles. That is the road to which this suit relates. According to the most liberal construction of the act of March 4, 1874, and that of March 16, 1878, the time limited for the completion of that road expired, at least, in May, 1882, eight years after the railway company filed its bond, as required by the ninth section of the act of 1874. It is conceded that the Portage Company never completed its land-grant division; nor did it ever construct any part of the road from Genoa northerly, as required by the act of 1874. The bill alleges that the Portage Company broke down in the monetary panic of 1873–74, under a large load of debts and embarrassments, and lay dormant until late in the year 1880, when its stockholders employed one Gaylord to find parties able and disposed to revive it and put it on the way of success; that the work of its rehabilitation had so far progressed that in the fall of 1881, and early in 1882, the company borrowed large sums of money, and expended them in pushing the construction of the land-grant division in which it was interested; that, on the 19th of January, 1882, more than one-half of the *substructure* of that division had been completed; that at the time last named more than 1,600 men were at work upon it, and its construction, in ample time to lay the rails and complete the division before May 5, 1882, was assured. It is further alleged that the Portage Company would have completed its land-grant road but for the following causes: (1) The passage by the state legislature of the act of February 16, 1882, revoking and annulling the grant contained in the act of March 4, 1874, which destroyed the credit of the company while actively engaged, under many disadvantages, in the construction of its road. (2) That the Omaha Company, its agents and emissaries, interfered with and defeated the efforts of the Portage Company to complete its road within the required time.

Although the act of June 3, 1856, provided that if the roads therein named were not completed within 10 years no further sales should

be made, and the lands unsold should revert to the United States, and although the only extension of the period for such completion ever made by congress was for five years from and after the passage of the act of May 5, 1864, no question is made in the present suit as to the title of these lands being in the state, at the date of the passage of the act of March 4, 1874, for all the purposes indicated in the acts of congress. This, perhaps, is because of the decision in *Schulenberg* v. *Harriman*, 21 Wall. 44, in which the court had occasion to interpret the acts of June 3, 1856, and May 5, 1864, holding that the requirement that the lands remaining unsold after a specified time shall revert to the United States, if the road be not then completed, to be nothing more than a provision that the grant shall be void if a condition subsequent be not performed; that, when a grant upon condition subsequent proceeds from the government, no individual can assail the title upon the ground that the grantee has failed to perform such condition; and that the United States having taken no action to enforce the forfeiture of the estate granted, "the title remained in the state as completely as it existed on the day when the title by location of the route of the railroad acquired precision, and became attached to the adjoining alternate sections." See, also, *McMicken* v. *U. S.*, 97 U. S. 204, 217; *Grinnell* v. *Railroad Co.*, 103 U. S. 739, 744; *Van Wyck* v. *Knevals*, 106 U. S. 360, 368, 1 Sup. Ct. Rep. 336; *Railroad Co.* v. *McGee*, 115 U. S. 469, 473, 6 Sup. Ct. Rep. 123. These authorities also indicate the mode in which the right to take advantage of the non-performance of a condition subsequent, annexed to a public grant, may be exercised, namely, "by judicial proceedings authorized by law, the equivalent of an inquest of office at common law, finding the fact of forfeiture, or adjudging the restoration of the estate on that ground," *or* by "legislative assertion of ownership of the property for breach of the condition, such as an act directing the possession and appropriation of the property, or that it be offered for sale or settlement."

The questions to which the attention of the court has been principally directed relate, more or less, to the act of February 16, 1882, revoking and annulling the grant to the Portage Company. The main contention of that company is that the grant of 1874, the acceptance thereof, and the bond given for the performance of the condition as to the construction of the land-grant division, constituted a contract, entitling it to earn the lands by completing the 65 miles of railway, to the west end of Lake Superior, by May 5, 1882, without opposition or hindrance on the part of the state; consequently, it is argued, the forfeiture declared by the act of 1882 impaired the obligation of that contract, and was unconstitutional and void.

On the part of the Omaha Company it is contended that one of the conditions of the grant to the Portage Company was that it would construct and put in operation its road from Genoa northerly at the rate of 20 miles each year; that no part of that road had been constructed when the act of 1882 was passed; and that by reason of such default the state had the right to withdraw the grant from the latter company without regard to what had or had not been done towards the construc-

tion of its land-grant division. To this the plaintiff replies that the obligation which the Portage Company assumed with reference to its road from Genoa northerly was not made, nor intended to be made, a condition of its right to earn the lands applicable to that part of the road between the point of intersection of the Bayfield branch with the branch extending to the west end of Lake Superior, and that, consistently with the acts of congress, the state could not make the right to earn these lands depend upon the construction of any part of its line except that which congress intended to aid by the grant.

It is also contended by the Omaha Company that the grant to the Portage Company was beyond the power of the state to make; that the mode in which the state disposed of the lands to the latter company was inconsistent with that prescribed in the act of congress,—that is, that the state had no authority, in advance of the completion of the road, to dispose of the land, by sale, conveyance, or otherwise, beyond 120 sections, or to make any additional contract in respect to their disposition. To this the plaintiff replies that the act of 1864, by necessary implication, permitted the state to dispose of the lands, subject to the conditions of the grant, as to the time when the absolute title should pass from the state to the corporation earning them, and as to the time within which the road should be completed. Such, it is claimed, was all that was done by the act of 1874.

As will be seen from the views hereafter expressed, touching other questions, it is not necessary to decide whether the eighth section of the act of 1874 made the construction by the Portage Company of its road from Genoa northerly *a condition* of the grant to it of these lands, or whether such a condition could have been legally imposed by the state. The court is inclined to the opinion that, if the Portage Company had duly performed the condition prescribed as to the completion of its land-grant division, its right to the lands applicable to that division, and expressly set apart to aid in its construction, would not have been affected by its failure to construct the Genoa branch. But the decision will not be placed upon that interpretation of the legislation in question.

Nor will it be necessary to determine the other questions above stated, nor the question as to the validity of the revocation contained in the act of February 16, 1882; for if it be assumed that such revocation was a nullity, as impairing the obligation of the alleged contract between the Portage Company and the state, especially because made before the expiration of the period limited for the completion of its road, and while the company was engaged in constructing it; if the mode in which the state disposed of the lands to the Portage Company be conceded to have been consistent with the acts of congress; and if the authority of that company to mortgage the lands in order to raise money for the construction of the road be admitted,—still there remain, in the way of granting the relief sought, these stubborn, indisputable facts:

*First*, that no corporation could acquire, and therefore could not pass, an interest in the lands, except subject to the condition prescribed in the act of the state legislature as to the time within which the land-grant

division should be completed, and therefore subject to the right of the state, in some appropriate mode, to resume its ownership and possession of the lands for any substantial failure to perform that condition.

*Second,* that the road was not constructed or completed within the time prescribed by the acts of March 4, 1874, and March 16, 1878.

*Third,* that after the expiration of that period the revocation, annulment, and resumption declared by the act of February 16, 1882, and the grant in the same act to the Omaha Company, were in all things confirmed by the act of March 5, 1883, which, besides, repealed all previous acts interfering with or in any manner conflicting with such act of confirmation.

If the act of February 16, 1882, was a valid exercise of power by the legislature, that, plainly, is an end of this branch of the case; but if it was unconstitutional and void, upon any ground whatever, its passage did not in a legal sense deprive the Portage Company of the right to proceed with the work of construction, and by completing the road within the required time become entitled to receive patents, or to compel any corporation or persons to whom patents were wrongfully issued to surrender the title. The validity and effect of the confirmatory act of March 5, 1883, does not depend upon the validity of the act of February 16, 1882; for, if the latter act was void, it was clearly within the power of the legislature, by the act of 1883,—neither the road, nor any 20 continuous miles thereof, having at its date been completed by the Portage Company,—to withdraw or annul the grant to that company, and to make a new grant of the lands to another corporation. The revocation in the act of March 5, 1883, of the grant to the Portage Company, accompanied by a confirmation, in the same act, of the grant of the same lands to the Omaha Company, was equivalent to a revocation, made for the first time on that day, and to an affirmative grant, then, for the first time, to that company. The passage by the legislature, in 1882, of an act that was void did not prevent it from passing a valid act in 1883, touching the same subject. In *Strother* v. *Lucas,* 12 Pet. 454, it was said:

"That a grant may be made by a law, as well as a patent pursuant to a law, is undoubted, (*Fletcher* v. *Peck,* 6 Cranch, 128;) and a confirmation by a law is as fully, to all intents and purposes, a grant as if it contained in terms a grant *de novo.*"

See, also, *Field* v. *Seabury,* 19 How. 323, 334; *Langdeau* v. *Hanes,* 21 Wall. 521, 530; *Slidell* v. *Grandjean,* 111 U. S. 412, 439, 4 Sup. Ct. Rep. 475; *Whitney* v. *Morrow,* 112 U. S. 693, 695, 5 Sup. Ct. Rep. 333.

It results from what has been said that, unless restrained by some legal obligation or contract from revoking the grant to the Portage Company, after the expiration of the time limited for the completion of the road to the west end of Lake Superior, the power of the state to pass the act of March 5, 1883, cannot be questioned. Were the hands of the state tied by any such obligation or contract? It has already been said that the mere revocation of February 16, 1882, if invalid, did not put the state under any legal obligation to forbear the exercise of any power it had

after, and by reason of, the failure of that company to complete its land-grant road within the time stipulated.

Assuming that the completion of the road, within the time limited, was rendered impossible by the act annulling the grant made to the Portage Company, it is contended that the case comes within the familiar rule that "where a condition subsequent be possible when made, and becomes impossible by act of God or the king's enemy, or the law, or the grantor, the estate, having once vested, is not thereby divested by the failure, but becomes absolute;" citing Co. Litt. 206a, 206b; 4 Kent, Comm. 130; *Davis* v. *Gray*, 16 Wall. 230, 231. This rule cannot be applied to the present case. It is not to be disputed that the revocation of the grant to the Portage Company had an injurious effect upon its credit. But, in a legal sense, such revocation by an unconstitutional, void act of legislation—which the plaintiff affirms the act of February 16, 1882, to be—cannot be said to have made impossible the performance of the condition upon which the company's title to the lands depended. The attempted revocation by the legislature, in 1882, and the loss by the company of credit in financial circles, do not, in law, hold the relation of cause and effect. The contrary view is not sustained by *Davis* v. *Gray*, 16 Wall. 203, 230. While the court there recognized the rule excusing the performance of a condition subsequent where performance was rendered impossible by the act of the law or of the grantor, it was alleged in the bill, and admitted by the demurrer, that the state, by plunging her people into civil war, had herself prevented the railroad company from earning the grant of lands made in aid of the construction of its road. A condition of war, it was conceded, wholly precluded the completion of the road. But, even in that case, performance within a reasonable time was held to be essential to any claim to have the benefit of the grant. Here there has not been performance by the Portage Company in respect to any part of its land-grant division. If the act of 1882 was void, and if, despite its passage, the Portage Company had completed the road within the required time, it would not be disputed by the plaintiff that, as between the company and the state, or any other grantee of the state, the equitable title to lands would have been in that company. Its misfortune—assuming the representations as to its general financial condition to be true—was, that it had no credit of consequence except such as it got from the state's grant of lands: a circumstance that cannot control the determination of the question whether the act of 1882, in a legal sense, rendered it impossible to complete the road in time. If this be not so, it would follow that the act of 1882 would excuse or not excuse the failure of the Portage Company to complete the road within the time as the evidence was the one way or the other touching its financial ability to have done so, apart from the credit given by the grant of the lands in dispute. But the rule invoked by the plaintiff surely does not rest upon such a shifting foundation. Within that rule the impossibility to perform a condition subsequent is either one arising from some obstacle interposed by the grantor, actually precluding or preventing performance by the grantee, or one that en-

sues, as matter of law, from something that the grantor did or caused to be done.   There is no claim of actual interruption by the officers or agents of the state of the construction of the road, and, assuming the act of 1882 to have been unconstitutional, it cannot be true, in any legal sense, that non-performance of the condition, as to the completion of the road within the prescribed time, resulted from the mere passage of that act.

It remains to consider other aspects of the case that have been presented with marked ability by the counsel for the plaintiff.   It is contended, in substance, that the forfeiture of the land grant was caused by false representations made to the legislature by the Omaha Company, which desired the transfer of the grant to itself to aid in the construction of its own road, and that that company, by fictitious suits, and by corruptly conspiring with officers of the Portage Company, wrongfully and fraudulently prevented the latter company from performing the condition in respect to the time within which the road was to be completed. Consequently, the lands and their proceeds should be subjected by a court of equity to the debts of the Portage Company, secured by its land mortgage.   The principal allegation of the bill as to what the Omaha Company did is:

"Furthermore, it, and at its instance others employed by it, and especially the said A. A. Jackson and C. J. Barnes, who were well known as officers of the Portage Company, and understood to be authorized to speak in its behalf, falsely represented to members of said legislature that the Portage Company had made no substantial progress towards the construction of said land-grant division, and never had any considerable number of men at work thereon, and was wholly without means or credit to prosecute said work; that it had at last voluntarily and finally abandoned all attempt to construct the same, and that it was willing to have the grant to it forfeited and given to the Omaha Company; whereupon, the legislature of Wisconsin, relying on these false representations, and without inquiry or hearing, hurriedly passed the act of February 16, 1882, above named, to forfeit the said land grant of the Portage Company and confer it on the Omaha Company."

Undoubtedly the Omaha Company was both willing and anxious that this land grant should be wrested from the Portage Company and transferred to itself, and to effect that end it appeared by its agents before legislative committees for the purpose of showing that the Portage Company did not have the means or credit necessary to construct, and never would construct, the road in question within the time fixed; and it may be assumed, for the purposes of this case, that the agents of the Omaha Company made representations as to the condition of the other company that were not in all respects consistent with the truth or with fair dealing. Still the question arises, how is a judicial tribunal to ascertain the extent to which the action of the legislative department in revoking this grant was controlled or influenced by representations made to its members by the Omaha Company about the other company?   Can the courts, in any case, assume that the legislature was not fully informed when it passed a statute relating to public objects, as to every fact essential to an intelligent determination of the matters to which that statute relates? Must it not be conclusively presumed that in disposing of lands held in

trust for public purposes it was controlled entirely by considerations of the public good, and not in any degree by false representations of individuals having private ends to subserve, and having no special concern either for the general welfare or for the rights of other individuals?

These questions are all answered in numerous adjudged cases, the leading one of which is *Fletcher* v. *Peck*, 6 Cranch, 87, 129, 130. That was an action for breach of certain covenants in a deed made by Peck for lands embraced in a purchase by Gunn and others from the state of Georgia, under an act passed by the legislature of that state. One of the covenants alleged to have been broken was that all the title the state ever had in the premises had been legally conveyed to Peck, the grantor. It was assigned, in substance, as a breach of that covenant that the act there in question was a nullity, and so the title of the state did not pass to Peck, because its passage was procured by corruption and undue influence used by the original grantees from the state upon members of the legislature. Chief Justice MARSHALL, speaking for the court, said:

"That corruption should find its way into the government of our infant republics, and contaminate the very source of legislation, or that impure motives should contribute to the passage of a law, or the formation of a legislative contract, are circumstances most deeply to be deplored. How far a court of justice would in any case be competent, on proceedings instituted by the state itself, to vacate a contract thus formed, and to annul rights acquired under that contract by third persons having no notice of the improper means by which it was obtained, is a question which the court would approach with much circumspection. It may well be doubted how far the validity of a law depends upon the motives of its framers, and how far the particular inducements operating on members of the supreme sovereign power of the state, to the formation of a contract by that power, are examinable in a court of justice. If the principle be conceded that an act of the supreme sovereign power might be declared null by a court, in consequence of the means which procured it, still would there be much difficulty in saying to what extent those means must be applied to produce this effect? Must it be direct corruption, or would interest or undue influence of any kind be sufficient? Must the vitiating cause operate on a majority, or on what number of the members? Would the act be null, whatever might be the wish of the nation, or would its obligation or nullity depend upon the public sentiment? If the majority of the legislature be corrupted, it may well be doubted whether it be within the province of the judiciary to control their conduct; and, if less than a majority act from impure motives, the principle by which judicial interference would be regulated is not clearly discerned. * * * If the title be plainly deduced from a legislative act, which the legislature might constitutionally pass, if the act be clothed with all the requisite forms of a law, a court, sitting as a court of law, cannot sustain a suit brought by one individual against another, founded on the allegation that the act is a nullity, in consequence of the impure motives which influenced certain members of the legislature which passed the law."

It is true that there is no suggestion in the present case that the act of revocation of February 16, 1882, was procured by bribery or corruption practiced upon members of the Wisconsin legislature. But the charge is that that body was induced by false representations, made by the agents of the Omaha Company, to do what they would not otherwise have done. This difference in the facts does not make the princi-

ples announced in *Fletcher* v. *Peck* inapplicable to the present case; for, if an act of legislation cannot be impeached by proof of corruption upon the part of those who passed it, much less can it be made a matter of proof that legislators were deceived or misled by false representations as to facts involved in proposed legislation of a public character. The principle upon which *Fletcher* v. *Peck* rests excludes all extrinsic evidence of witnesses as to the motives of legislators, or as to the grounds of legislative action. In *Ex parte McCardle*, 7 Wall. 514, the court said:

"We are not at liberty to inquire into the motives of the legislature. We can only examine into its power under the constitution."

In *Doyle* v. *Insurance Co.*, 94 U. S. 541:

"If the act done by the state is legal,—is not in violation of the constitution or laws of the United States,—it is quite out of the power of any court to inquire what was the intention of those who enacted the law."

So. in *Soon Hing* v. *Crowley*, 113 U. S. 703, 704, 710, 5 Sup. Ct. Rep. 730:

"The rule is general, with reference to the enactments of all legislative bodies, that the courts cannot inquire into the motives of the legislators in passing them, except as they may be disclosed on the face of the acts, or inferable from their operation, considered with reference to the condition of the country and existing legislation. The motives of the legislators, considered as the purposes they had in view, will always be presumed to be to accomplish that which follows as the natural and reasonable effect of their enactments. Their motives, considered as the moral inducements for their votes, will vary with the different members of the legislative body. The diverse character of such motives, and the impossibility of penetrating into the hearts of men and ascertaining the truth, precludes all such inquiries as impracticable and futile."

It was well said by the supreme court of Michigan, in *Plank-Road Co.* v. *Woodhull*, 25 Mich. 103:

"The legislature will not only choose its own mode of collecting information to guide its legislative discretion, but from due courtesy to a co-ordinate department of the government we must assume that those methods were the suitable and proper ones, and that they led to correct results; and, if the records show no investigation, we must still presume the proper information was obtained, for we must not suppose the legislature to have acted improperly, unadvisedly, or from any other than public motives, under any circumstances, when acting within the limits of its authority."

To the same general effect are many other cases. *Aldridge* v. *Williams*, 3 How. 24; *Maynard* v. *Hill*, 125 U. S. 190, 209, 8 Sup. Ct. Rep. 723; *Johnson* v. *Higgins*, 3 Metc. (Ky.) 566, 576; *Railway Co.* v. *Cooper*, 33 Pa. St. 278, 283; *Stark* v. *McGowen*, 1 Nott & McC. 387, 400; *People* v. *Flagg*, 46 N. Y. 405; *Wright* v. *Defrees*, 8 Ind. 298, 302; *Jones* v. *Jones*, 12 Pa. St. 350, 357.

For the reasons stated, evidence as to the falsity or truth of representations made by the Omaha Company, or its agents, to the legislature, or to legislative committees, in respect either of this land grant or of the Portage Company, as well as evidence as to any efforts by the Omaha Company to bring about the revocation of the grant made

to the other company, is immaterial to the present controversy. Such evidence cannot be made the basis of judicial determination without intrenching upon the independence of a co-ordinate department of the government, and impairing its right to proceed, in the exercise of its functions, upon such information as it deems necessary. An adjudication as to rights acquired by individuals under public enactments, based upon an inquiry as to whether those individuals made false representations to the legislature, or as to whether the legislature was probably influenced by such representations, is an indirect interference with the power of the legislature, acting within the limits of its authority, to enact such laws as it deems best for the general good. The courts must, of necessity, presume (whatever may be averred to the contrary) that no general statute is ever passed either for want of information upon the part of the legislature or because it was misled by the false representation of lobbyists or interested parties. They must restrict their inquiries to the validity of such legislation. Such is the established doctrine as to legislative enactments relating to public objects, although a different rule is recognized by some courts in respect to private statutes alleged to have been procured by fraud practiced upon the legislature by those claiming benefits under them.

What has been said disposes of the suggestion that the dispersion of the force employed by the Portage Company in the early part of the year 1882 in the construction of its road, the suspension of the work of construction, and its inability to raise the necessary funds for the completion of the road within the time stipulated, was the result of the machinations of agents of the Omaha Company, acting by its authority, and of the corrupt conspiring by those agents with officers of the Portage Company, whereby those officers neglected to do towards the timely completion of the road what, in fidelity to their employers, they might have done. Whether this arraignment of the Omaha Company is justified by the evidence, or whether the Portage Company could, in its weak financial condition in 1882, have completed the road within the required time, if its plans had not been interfered with, in the manner stated, it is not necessary to determine; for, as already indicated, if all that is said in respect to the conduct of the Omaha Company were clearly established, the settled principles of law forbid the court from assuming that the legislative department of the state, when it passed the act of 1882, as well as the confirmatory act of 1883, was not in possession of every fact affecting the justice of such legislation. These principles cannot be disregarded in order to remedy the hardships of particular cases. If each member of the legislature was aware when that act was passed of everything which it is alleged was done by the Omaha Company in regard to this land grant and its rival company, and yet in discharge of what it deemed a public duty, and in order to secure the speedy completion of a public highway, supposed to be imperatively required by the interests of their constituents, the legislature passed the confirmatory act of 1883, and thereby selected the beneficiary of the grant made by congress in aid of the construction of that highway, the conduct of the

Omaha Company surely would not constitute any ground why a court of equity should attempt to thwart the wishes of the legislative department. That is precisely what would be done if the court took from that company the benefit of the grant deliberately made to it by the legislature in aid of the construction of its road. Legislative enactments relating to public objects, so far as they confer rights upon individuals, must stand, if they be constitutional, without any attempt upon the part of the courts to conjecture or ascertain what the members of the legislature would or would not have done under any given state of facts established by extrinsic evidence.

It is further said in behalf of the plaintiff that the Omaha Company became, as early as January and February, 1882, the owner of every share of the capital stock of the Portage Company, and of a large part of its bonded and floating indebtedness; that the former company built a road from Mud Lake to Superior City, parallel to and a few yards from the half-graded line of the latter company; and that the road so built was such an one as was described in the acts of congress of 1856 and 1864. Upon these facts the plaintiffs rest the contention that as that road was constructed by a corporation which was the sole stockholder and a principal creditor of the Portage Company, and as the law avoids forfeitures where practicable, the condition imposed by the state may be regarded as having been duly performed, within the rule that "any one who is interested in a condition may perform it, and and when performed, it is gone forever;" citing 2 Crabb, Real Prop. 815; 2 Washb. Real Prop. (2d Ed.) 12, and other authorities.

The court is unable to assent to this view, for the reason, if there were no other, that what was done by the Omaha Company towards the construction of its road to Superior City was not done by it as a stockholder and creditor of the Portage Company. It did not elect or intend in that capacity to perform the condition imposed by the state upon the latter company. The record conclusively establishes the fact that in constructing the road to the west end of Lake Superior the Omaha Company proceeded under its own charter, and represented its own stockholders, and not the stockholders of the other company. It built its own branch road, and did not complete the road commenced by the Portage Company. It was so understood by the plaintiff, for it alleges in the bill that "in the year 1882 the Omaha Company constructed its branch to Superior City, along-side of the partially constructed line of the Portage Company, and has ever since operated the same." And this is consistent with the second section of the act of February 16, 1882, which made the grant to the Omaha Company upon the express condition that it would continuously proceed with the construction of the road then "in part constructed by it between said point of intersection and the west end of Lake Superior," and complete it on or before December 1, 1882. It is impossible to suppose that the Omaha Company ever intended to perform the condition imposed upon the Portage Company in reference to the latter's road. It performed the condition imposed in the act granting these lands in aid of the construc-

tion of *its* road.    The plaintiff's whole case proceeds upon the theory
that the Omaha Company sought to prevent any result that would be
beneficial to the other company.    It would therefore be a perversion of
the rule upon which the plaintiff relies, and inconsistent with the entire
evidence, to say that the Omaha Company was interested in performing,
or intended to perform, or that the state regarded it as performing, the
condition in question for or in behalf of the Portage Company.    That
would make the Omaha Company do something for another corporation
which it did not elect to do, and was not in law bound to do.

Many other questions have been discussed by the counsel of the respect-
ive parties, about which the court forbears any expression of opinion.
Their determination is rendered unnecessary by the conclusions reached
upon the principal points.    The bill must be dismissed for want of
equity, and with costs to the defendants.    It is so ordered.