ANGLE et al. v. CHICAGO, P. & S. RY. CO. et al.

(Circuit Court, W. D. Wisconsin. July 21, 1897.)

FEDERAL COURTS—RULES OF DECISION—OPINION OF SUPREME COURT AS PRECEDENT.

Where the questions arising in a suit in a circuit court are the same as those involved in a suit between other parties which has been determined by the supreme court, and the evidence material to such questions is substantially the same, the decision of the supreme court, while it does not render the questions res judicata, constitutes a precedent which should be followed by the inferior court.

This was a suit in equity, in the nature of a creditors' bill, brought by Sarah R. Angle, administratrix, and Thomas M. Nelson, administrator, of the estate of H. G. Angle, deceased, against the Chicago, Portage & Superior Railway Company, the Chicago, St. Paul, Minneapolis & Omaha Railway Company, and the Farmers' Loan & Trust Company. On final hearing.

Burr W. Jones and F. J. Lamb, for complainants.
Thomas H. Wilson, for defendants.

BUNN, District Judge. It has not been, and is not now, my purpose to write an opinion in this case, but only to indicate very briefly, and in a general way, the conclusions reached, with the grounds on which they are based. Each party on the hearing having indicated a purpose of taking an appeal in the event of an adverse decision by this court, the case, when it goes up, will stand for hearing de novo in the appellate court upon the same allegations and the same evidence

as it stands here, so that the decision here will be but preliminary to a final hearing in the court of appeals. Nevertheless, the case has been argued with all the fullness that it could be if this was the court of last resort. Fully two weeks were consumed by oral argument of counsel on the hearing, and elaborate briefs have been prepared and filed since. This court has endeavored to give the case all the attention which its importance demands. The litigation has been in this court and the supreme court, in some form, for 10 or 12 years, and this is the final hearing, so far as this court is concerned, upon the equity side. The conclusion which the court has reached is that the bill of complaint must be dismissed for want of equity, on the ground, generally stated, that the allegations of the bill are not supported by the evidence. The case was first heard before Mr. Justice Harlan, on the circuit, upon general demurrer to the bill, and the demurrer sustained and the bill dismissed. 39 Fed. 912. An appeal was taken from that decision to the supreme court of the United States, and was decided by that court on January 4, 1894. By a careful opinion, prepared by Mr. Justice Brewer, the decision of the circuit court was reversed, and the allegations of the bill held to be sufficient to constitute a good cause in equity. The case is reported in 151 U. S. 1, 14 Sup. Ct. 240. It is claimed by plaintiffs' counsel that this decision constitutes, in an important sense, the law of this case, and so it does; but only to this extent: that, if the allegations of the bill are fairly supported by the evidence, there should be a decree for the plaintiffs. Since that case was in the supreme court, another case in equity has been decided there, to wit, the case of Farmers' Loan & Trust Co. v. Same Defendants, decided on May 4, 1896, and reported in 163 U. S. 31, 16 Sup. Ct. 917. That was a suit brought by the bondholders of the Portage & Superior Company, seeking to have their claim declared a lien upon the lands taken away from that company on account of a failure to perform the conditions of the grant, and conferred upon the Omaha Company. That case was also heard by Mr. Justice Harlan, at the circuit, upon the merits, and the bill dismissed for want of equity. See his opinion in 39 Fed. 143. The facts in this case are fully stated by Mr. Justice Harlan in his opinion, and also by Mr. Justice Brewer in the same case, and in this case on appeal in the supreme court, so that it seems quite unnecessary to restate them here. H. G. Angle, the husband of this plaintiff, made a contract with what is in this case called the Portage Company, in August, 1881, for the grading of the 65 miles of its road (being the land-grant portion thereof) from a point between townships 25 and 31 to the west end of Lake Superior. In 1887, the company having failed, the plaintiff, as Angle's administratrix, obtained a judgment in this court upon that contract for work done, and for damages and costs, in the sum of $205,883.19. The judgment not being satisfied, this suit was brought, in the nature of a creditors' bill, against the Omaha Railway Company, to have the judgment declared a lien upon the land-grant lands which the legislature by the acts of 1882 and 1883 had taken away from the Portage Company and conferred upon the Omaha Company, which had built the road, on the ground that those acts were unconstitutional and void,

because of fraud and wrongdoing committed by the officers of that company in obtaining the grant, in getting control of and wrecking the Portage Company, and depriving it of the opportunity and right to earn the lands under the grant to that company; alleging that the Omaha Company, on account of such wrongful acts, became and is a trustee of the lands, ex maleficio, for the creditors of the Portage Company. The nature and purpose of the suit brought by the trustee of the bondholders, as creditors of the Portage Company, were the same as in this,—to reach the land-grant lands in the hands of the Omaha Company, and have that company declared a trustee of the lands for the benefit of the bondholders. The material allegations of that bill are substantially the same as those of the bill in this case. If the proof is the same,—and it is claimed by counsel for defendant that it is,—then the decision of the supreme court dismissing the bill is an authority for this case in this court, not on the ground that it is stare decisis, because the parties are not the same, but as a precedent by the highest court, which is binding upon an inferior court of the same jurisdiction. The allegations of the bill and the issue being the same, if the evidence in support of the bill is also the same, or substantially the same, the decision would constitute a precedent or rule which I think would be binding upon this court, though not upon the supreme court, if the case should ever get there. I have read carefully all the evidence in both records, and the best judgment I can form is that the testimony, so far as it has a material bearing upon the issue, is substantially the same in each case, and that where there is a difference, as in the testimony of Porter, Spooner, and Peck, that difference makes rather in favor of the defendant than the plaintiff. The supreme court in that case held that the allegations of the bill were not supported by the evidence; that Barnes and Jackson had a right to sell the stock standing in Jackson's name; that the Omaha Company had a right to buy it, and that in doing so it did no wrong, and that it had a right to take the land grant which the legislature conferred upon it; and that in doing so it committed no wrong.

It is insisted by counsel that the case at bar should be heard and decided as though the so-called "Bond Case" had never been heard. No doubt, it is to be tried on its own merits; but the Bond Case, in the circumstances, can hardly be disregarded as a rule and precedent. My opinion is that it should have very great weight, and I confess that I am unable to distinguish it materially from this upon any just principle of legal procedure. The prime difficulty in this case, as in the Bond Case, is that the allegations of the bill are not supported by the evidence. The allegations of fraud and bribery and conspiracy and wrongdoing are full and profuse in the bill. I should entertain no doubt of their sufficiency as they stand in the bill. But it seems to me there is a fatal lack of evidence to support the allegations. It is a poor lawyer that, in the privacy of his office, cannot find language to make a case in equity on paper,—especially as he is not troubled with any necessity for verifying the bill upon oath. But in legal controversies it is not at all uncommon that "the success and vigor of the war do not quite come up to the lofty and sounding phrase of the manifesto."

The evidence, in my judgment, shows that the final collapse of the Portage Company in the winter of 1882 was not caused by any wrong committed by Jackson or C. J. Barnes or Porter or Cable or the Omaha Company, but by the continued and hopeless insolvency of the Portage Company, caused by an inadequate and irretrievably bad management. The sale of the $1,000,000 of Jackson stock and the transfer of the land grant to the Omaha Company were, it is true, coincident with the final collapse of the Portage Company; but there is no reason to believe, from the testimony, that these things stood in the relation of cause and effect to such final collapse. They may with much more propriety be said to be an effect or result of the general insolvency and total inability of the Portage Company to raise money for the accomplishment of such an enterprise. Jackson did not wish to sell to the Omaha Company. He had been connected with the Portage Company from the beginning as attorney. It was clearly for his interest that that company should build the road and earn the grant. There is no reason to doubt his good faith when he says that he wanted to see the Portage Company succeed, and that he did all he could to that end, and to get that company, or those representing it, to take the stock and pay his claim and those of his friends, Sloan and Ruger. The entire amount of those claims was but $30,000, —$18,000 to Jackson for legal services, $2,000 to Sloan for legal services, and $10,000 to Ruger for engineering services. If these small claims could have been paid, Jackson would have had no further claim, except two or three thousand dollars for legal services not included in the judgment against the construction company, and which he has never yet received. It is very significant that under the management of Schofield and Gaylord, with their interminable series of contracts with the investment company and with the "English parties," so called, for the raising of money, the company was in debt for everything; that it was unable to pay its attorneys or its engineers, or the men who were doing the grading. These various agreements without end of words brought no money. There were constating agreements and investment contracts in plenty, but no investment and no money. Apparently, one leading purpose of these contracts was to make safe provision for an equal division of the profits of the land grant between Gaylord, Schofield, and Barnes, by the earlier ones; and by the later, between Gaylord, Schofield, and the investment company. John C. Barnes was one of the original promoters until he fell in with Willis Gaylord, who, uniting William H. Schofield with him, took the concern out of his hands. He says in many places that he had not much to do with it after they came in. He had put in some money,—no one knows how much, but about all he had; he thinks, from $100,000 to $200,000; he cannot remember. Gaylord was a mere adventurer, with no money, nor much character, whose business, as J. C. Barnes says, seemed to be to work such schemes as this. Schofield had once had money, but had lost it. He could put but little into the enterprise. The land grant was an uncertain quantity at that time. It is easy now, after the road is built and the lands partly sold, to see that the grant was valuable; but Gaylord and Schofield had much difficulty in satisfying

the English parties (Hickson and Meddaugh, the president and attorney of the Grand Trunk, Limited, an English corporation) that the grant was of much value. They had in their hands a large majority of the stock of the Portage Company, amounting to $5,100,000, which, if lawfully issued, as they claimed it was, would give control of the company. But, to raise money in England, they must issue a prospectus to advertise the stock and bonds. Bills had been introduced into the legislature of Wisconsin in the winter of 1881 forfeiting the grant, and conferring it on other companies. Partly by the efforts of Jackson and Sloan these bills had been defeated. There was danger, amounting almost to a certainty, that other bills would be introduced in the winter of 1882. There was question made as to the value of the grant. The English parties had been informed that it was not as valuable as had been represented by the officers and agents of the Portage Company. In England, where people were more honest and the law more strict than elsewhere, such things had to be conducted openly and on the square, or the promoters of the prospectus would render themselves personally liable. This was dangerous ground to tread. All these discouraging things must be placed in the prospectus or manifesto which was to take the people's money. But, if these things were put in, nobody would buy. There was another controlling consideration: A suggestion was made when all the parties were met in Chicago in January, 1882, that the Jackson and Barnes $1,000,000 of stock constituted a majority of legal stock, with whomsoever should own it, because the $5,100,000 in the hands of the English parties had not been legally issued, under the laws of Wisconsin, which required a consideration for the issue,—something to be paid for it. It was merely placed there by Gaylord and Schofield, who carried the stock as well as the corporation in their pockets from country to country, but without consideration, except to raise money upon whenever they could be sold. It had never been sold, or anything paid for it. Meddaugh was said to be a competent man and lawyer, and had examined and looked far into the affairs of the Portage Company. He claimed the stock in their hands was legally issued. Jackson thought otherwise, and said so. It is now admitted that Jackson had the best of the argument, and that his and Barnes' stock was the only valid stock of any controlling amount, and the far greater amount of the stock in the hands of the English parties would not give control of the company. When this doubt came to the knowledge of Hickson, he refused to go on with the negotiations. He had come to Chicago, where they were to hold a general meeting of the Grand Trunk officers, prepared to advance $50,000 to the Portage Company, provided he found everything right. But the time for the completion of the road of the Portage Company was about to expire. A bill had already been introduced (or was about to be) in the legislature to forfeit the grant, and this, with the doubt as to the validity of the English stock, caused Hickson to withdraw from the enterprise. These considerations were quite as much the cause of the collapse of the company, and the cessation of the work, as the act of the Omaha Company in purchasing the Jackson stock,— in my judgment, much more so. Negotiations were broken off. Hick-

son withdrew, and Gen. Schofield went home to New York two or three days before the contract for the sale of the Jackson stock had been perfected, on January 19th. Hickson had been offered the Jackson stock, but refused to purchase. John C. Barnes and C. J. Barnes could have had it any time by paying the sum of $30,000,— the amount of Jackson's, Sloan's, and Ruger's claims. But they could not buy. They had no money. Jackson is arraigned for betraying his company and selling his stock to Cable, who represented the Omaha Company. But what could he do? If the company collapsed and the grant was taken away, his stock and all the stock would be worthless. He had a right, under these circumstances, to secure himself and Barnes, Ruger, and Sloan, who with him had stood by the company so long. The legal title was in him, but, after he and Sloan and Ruger were paid, the balance belonged to the Barnes interest. Jackson is also blamed for suggesting to the English parties that the stock in their hands was not legally issued, because it is said this information discouraged the negotiations for the advance of the $50,000, though it is conceded that Jackson was right in his opinion, and Meddaugh, the English lawyer, was wrong. But why should not Jackson express his opinion? Or what reason was there for nursing a lie, so long as he knew the stock was not legally issued stock, under the laws of the state where he had practiced his profession so many years? Upon a careful consideration of the evidence, I am unable to find anything in the conduct of Jackson to subject him to criticism. He had the consent of the two Barneses to sell the stock. Indeed, the negotiations for sale and the sale were conducted by Charles J. Barnes, the nephew of his uncle, in New York, who had been notified, and who telegraphed C. J. Barnes to look out for his interests. That Jackson and Barnes owned this stock, and had the right to sell it; that they were lawfully in possession of it, and had been guilty of no wrong in obtaining that possession; and that Porter and Cable had the right to purchase from them,—seems to me very clear, from the evidence.

It is claimed that it was the sale of this stock that wrecked the Portage Company. This is not shown to be true, but we will suppose that it is. If it was the only validly issued stock, and Barnes and Jackson had the right to sell it to protect their own interests, and the representatives of the Omaha Company had the right to purchase it, how could the Omaha Company be made responsible for the consequences of the transfer? But, in my judgment of the evidence, the sale of the Jackson stock is not what wrecked the corporation. It was merely a coincident circumstance in the final drama, and was not the cause. The cause was the weak and vicious management of the company, and its utter want of capital and financial standing and ability. Suppose the $50,000 which Hickson brought to Chicago to pay over to the company if he found everything all right had been paid. Sloan testified it would have been but a mere drop in the bucket, which is, no doubt, true. If the company had not applied it to pay for labor and services already performed, it may have sufficed to continue the work for a few days, perhaps two or three weeks, as the evidence shows that the work was costing some $3,000 a day.

What good ground of hope was there that with bills in the legislature to forfeit the grant, with the company owing $140,000, and not a mile of road completed after having possession of the grant for eight years, more money could have been raised to complete the road? Gaylord and Schofield had entire control of the affairs of the corporation. They had no money and no credit, and no sufficient ability to finance such an enterprise. The wonder is that the grant had not been taken away long before. But the state of Wisconsin was very indulgent, as it always had been to railroad corporations to whom it had made its grants of land to aid in the construction of these great internal improvements. This grant was conferred upon the company in March, 1874. In the act granting the lands was this condition:

"That said company shall construct, complete and put in operation that part of its said railway above mentioned as soon as a railway shall be constructed and put in operation from the said city of Hudson to said point of intersection [Superior Junction] and within five years from its acceptance of said lands as herein provided, and shall also construct and put in operation the railway of said company from Genoa northerly at the rate of twenty miles per year." Laws 1874, p. 188, § 8.

In March, 1878, the state further extended the time three years. The company was given abundant time in which to complete the building of the road. It is true that some of these years covered very hard times, but other roads, including the Omaha Company, defendant, pushed its railroad enterprises in spite of the hard times. There is not much need to look about for conspiracy or fraud as a motive force in inducing the legislature to take the grant away from the Portage Company and confer it upon the defendant. The financing of the enterprise under the lead of Barnes, Gaylord, and Schofield had proved a dismal and chronic failure. The Omaha Company was well known to the people of the state, and had a good standing and reputation for able and efficient management. The same act which granted the lands sought to be reached in this case to the Chicago & Northern Pacific Air Line Company, which company was afterwards changed to the Portage & Superior Company, also granted to the North Wisconsin Railway Company, afterwards succeeded and represented by the Omaha Company, that part of the congressional grant applicable to the land from Hudson, on the St. Croix river, to Bayfield,—a distance of about 170 miles. This line was completed by the defendant company in 1881. The defendant also completed its line from Hudson to and beyond Superior Junction in 1880, and in 1880 and 1881 had commenced the construction of a road between a point on its Bayfield line, near Superior Junction, and Superior City. From the experience the state had had with the defendant company, there could be no cause for wonder that the legislature should entertain some confidence in its ability to build the road and earn the grant, which was what the state, as well as the general government, in conferring the grant, most wanted. The state, as well as the general government, wanted the added industries and commercial facilities which the building of the road would give. The only fulfillment of the original purpose of the grant was to be found in the completion of the line of road for the building of which the grant was made.

The Omaha Company, upon the passage of the act of February 16, 1882, proceeded to justify the confidence which had been placed in it by the legislature, by building the line of road the same season, and without any delay; and the state, by its governor, conveyed to it the lands, and the legislature, by act of March 7, 1883, confirmed the previous grant. See chapter 29, Laws 1883. The time for finishing the 65 miles from Superior Junction to Superior City under the extension granted in 1878 expired on May 5, 1882, while the act taking away the grant was passed on February 16th, previous. It is contended by plaintiff that the conditions of the grant as to the work north from Genoa—the company never having completed any part of that line as required by the act of 1874, which required 20 miles to be completed each year—did not apply to the portion of the grant from Superior Junction to Superior City. And on this ground Mr. Sloan, one of the attorneys for the company, at the meeting of all the parties in January, 1882, advised the company, when a bill to forfeit the grant was about to be introduced, that, if the bill passed, he thought the Portage Company, by going on and completing the line by May 5th, could successfully resist the taking away of the land grant in the courts, on the same ground, I suppose, as is claimed by the plaintiff,—that the forfeiture impaired the obligation of the contract which the Portage Company had with the state, and was therefore unconstitutional and void. But it is quite unnecessary to decide this contention, as the vital condition of Mr. Sloan's advice (that of going on and completing the line by May 5, 1882) was not kept,—no single mile of the line was ever completed; and, as pointed out by Mr. Justice Harlan in his opinion, if the act of February 16, 1882, was unconstitutional and void, its passage did not, in a legal sense, deprive the Portage Company of the right to proceed with the work, and to complete the construction by the time required by the act of 1878 extending the time; and, this not having been done, it was quite competent for the legislature, by the act of March 5, 1883, to revoke the grant, and to confer it upon the Omaha Company, which it did,—assuming that this purpose was not accomplished by the previous act of 1882.

Since the decision of the supreme court on demurrer in this case, the issues are mainly of fact. That is the way the case presents itself on this hearing. The important question is whether there is any sufficient evidence to support the allegations of conspiracy and fraud contained in the bill. And it seems just as true in this case as it was in the Bond Case that the allegations of the bill are not supported by the evidence. It is as true in this case as it was in the Bond Case, with reference to the charge that the Omaha Company wrongfully and fraudulently secured, through the action of the legislature, a transfer of the land grant to itself, that it is sufficient to say there is absolutely no foundation for it in the testimony. It does not appear that there was any corruption or attempted corruption by the Omaha Company, or any of the members of the legislature, or other officials. Everything it did was open and aboveboard. No creditor of the Portage Company had any legal or equitable right to any portion of those lands, and if the legislature had simply revoked

the grant, and resumed possession on behalf of the state, there would be no pretense of a claim that any such creditor could subject the lands, or any interest therein, to the satisfaction of his debt. No more can it where the grant is resumed by the state, and by the same act conferred upon another company. It is just as true in this case as it was in the Bond Case (for the issues and the evidence upon all these points are substantially the same) that, "putting the most unfavorable construction upon the testimony, it does not seem that either Jackson or Barnes can be condemned for any breach of trust or other obligation to the Portage Company, when, having offered the stock to the Grand Trunk Company at the price afterwards paid by Cable, and such offer having been declined, they sold it to the Omaha Company." As was said by the supreme court, "it may be that Schofield and Gaylord were deprived of profits which they expected to secure by successfully carrying through the negotiations with the Grand Trunk Company, but we do not understand that one stockholder is, by virtue of his ownership of stock, bound to continue in the holding of it, in order to allow another stockholder to make a profit out of negotiations pending." My own view, as has been shown, is that they were not so deprived of profits by the action of Jackson and Barnes, and that they can hardly be said to be deprived of profits which they never earned or merited. It is as true in this case as in the Bond Case that "Jackson was guilty of no breach of trust in selling the stock; that it belonged, both legally and equitably, to J. C. Barnes and himself; that they had a full legal and moral right to sell it to any one who would pay their price; and it equally follows that the Omaha Company and Cable, in making the purchase, were themselves guilty of no wrong."

This covers all the vital issues in the case. I have not, in this very cursory opinion, noticed all the contentions made by the plaintiffs' counsel. It was not my purpose to do so. The arguments of counsel for plaintiff are very full and able, and would be quite unanswerable, if the proof were as full and competent as the briefs of counsel. I have carefully considered all the points made, and am fully satisfied to decide the case upon the grounds stated,—of a lack of proof. No doubt, some allowance should be made on account of the fact that the plaintiff has been obliged to rely largely upon testimony drawn from those either in the interest of an adverse party, or from those against whom charges of fraud and conspiracy are made in the bill. But, all allowances being made that would be proper, it is evident that, from whatever source the evidence comes, it should be sufficient to sustain a cause of action in equity. The bill of complaint will be dismissed for want of equity, with costs.