(January 4, 1908.)

NELSON BENNETT COMPANY and ALEXANDER TO-PONCE, Respondents, v. TWIN FALLS LAND & WATER COMPANY, Appellant.

[93 Pac. 789.]

Mechanic's Lien Law—Right of Lien on Works Constructed Under Carey Act—Bill of Particulars—Submission of Controversies to Chief Engineer as Umpire—Binding Effect of Submission on All Parties to Contract—Acts of Engineer for Which His Decisions may be Set Aside—Sufficiency of Findings—Attorney's Fees on Foreclosure of Lien—Taxation of Costs.

1. Under the act of Congress of June 11, 1896 (6 Fed. Stat. Ann., p. 398, U. S. Comp. Stat. 1901, p. 1554), which is supplementary to the Carey act (6 Fed. Stat. Ann., pp. 396 to 398, U. S. Comp. Stat. 1901, pp. 1552-1554), and the act of the legislature of the state of Idaho of March 2, 1899 (Sess. Laws, 1899, p. 282), accepting the provisions of the Carey act and providing for the reclamation, occupation and disposal of lands thereunder, a lien is granted in favor of the person, company or association contracting for the construction of canals and reclamation works for the irrigation of arid lands thereunder, and such lien extends to all lands in the segregation that can be irrigated by such system to the full extent of the price per acre for which such person, company or association contracts and agrees to sell water rights, and the contractor or subcontractor performing work under such person, company or association, is entitled to the benefit of the lien laws to secure the payment to him for such work to the full extent of the title, interests, rights and claims of the company having the con-

tract from the state and to the full extent of, and commensurate with, the lien rights of such company.

2. Id.—The rights of the lien claimant who is a contractor or subcontractor under the person, company or association which has the contract from the state will extend to all the rights, interests, claim and title of such company in and to the works and irrigation system and lands thereunder, but the lien claimant cannot by foreclosure of his lien acquire any greater right than that possessed by such company or association.

3. Where a complaint states in ordinary and concise language the nature of the cause of action, and states the number of cubic yards of earth removed for which the plaintiff claims compensation and the classification to which the same belongs, and the specific contract or piece of work on which the same was performed, it is not open to demurrer on the ground of uncertainty or ambiguity in that particular, and it is not error for the trial court to deny a motion for a "bill of particulars" in such case requiring the plaintiff to state the particular amount claimed for every given number of feet in distance or at any given station upon the works.

4. Sec. 4209, Rev. Stat., provides the method for an adverse party securing an itemized statement of an account, and in addition to that provision of the statute, the court in an equity case has the inherent power to so regulate and control its proceedings as to require the party to furnish a bill of particulars in a proper case.

5. A stipulation in a contract requiring the submission of differences and controversies arising thereunder to the chief engineer of one of the contracting parties as umpire and leaving the measurements, estimates and classification of the work to him, and providing that his measurements and classifications shall not estop the party employing the engineer from disputing or questioning them, will not be enforced by the courts as a binding obligation against the other party thereto.

6. Where the issue tendered is that the chief engineer of the defendant company, selected as umpire to determine all questions of controversy, acted fraudulently and arbitrarily in making estimates, measurements and classifications, and without previously making any proper inspection on which to found an honest judgment, and with intent to injure and defraud the plaintiff and deprive it of its just compensation, and did arbitrarily and in violation of good faith make and cause to be made false and untrue estimates, measurements and classifications, such issue, if supported by the evidence, will authorize and justify a court in setting aside such final estimates, measurements and classifications and in hearing the evidence as to the true measurements and classifications that should have been made and determining the same as though no estimates,

measurements or classifications had been made by an engineer and no submission had ever been made.

7. Id.—A finding by the trial court on the foregoing issue "that the chief engineer wrongfully, arbitrarily and without having made proper observations, and without sufficient knowledge upon which to found a just judgment, in respect to the kind, quality and classification of materials, and in violation of good faith and duty, did make, cause to be made and permit untrue and grossly erroneous estimates and classifications of the kind, character and amount of materials removed and placed, and work done,'' is sufficient to support a judgment in favor of the plaintiff for the true measurements and amount of work done and the proper and just classifications as found from the evidence in the case.

8. Where the chief engineer of a defendant company who has been selected as umpire for the purpose of making a final determination of controversies and differences in reference to the work, material, measurements and classifications, retains in his service an assistant engineer who is manifestly prejudiced and biased against the contractor, and where, after such chief engineer has been advised of the animus, bias and prejudice of his assistant against the contractor, he causes such assistant engineer to make the measurements, estimates and classifications of the work done by such contractor, and it manifestly appears that such estimates and classifications have been unfair and unjust and discriminating against the contractor, the court, when appealed to, will set the same aside and ascertain from the evidence submitted the true amount of work done or material furnished and the proper measurements and classifications thereof, and order judgment accordingly.

9. Evidence in this case examined, and, *held,* sufficient to support findings and judgment entered and rendered thereon, except as to total number of cubic yards of earth moved, and judgment modified as to excess.

10. That portion of the lien laws of this state (Sec. 12, Lien Laws, 1899), which provides that upon the foreclosure of a mechanic's lien the court may allow reasonable attorney's fees in favor of the plaintiff, is constitutional and valid. *Thompson v. Wise Boy Min. & Milling Co.,* 9 Ida. 363, 74 Pac. 958, followed and approved. *Held,* further, that under the facts and circumstances of this case, and in view of the amount involved and the questions raised, an allowance of $10,000 as attorney's fees is not excessive.

11. Order made on motion to tax costs, examined and sustained. *Anderson v. Ferguson-Bach Sheep Company,* 12 Ida. 418, 86 Pac. 41, followed and approved.

(Syllabus by the court.)

APPEAL from the District Court of the Fourth Judicial District for the County of Cassia. Hon. Lyttleton Price, Judge.

Action by plaintiffs to foreclose a mechanic's lien. Judgment for the plaintiffs, and defendant moved for a new trial and appealed from the judgment and order. *Modified and affirmed.*

Henderson, Pierce, Critchlow & Barrette, and S. H. Hays, for Appellant.

Plaintiff should have been compelled to make more specific its complaint, or furnish a bill of particulars. We attacked the complaint herein by two methods—first by demurrer, pointing out with all possible clearness the defects thereof; second, by a demand for a bill of particulars supplying the manifest defects of the complaint. Under the decisions of this court it seems that the defect complained of should be pointed out by demurrer. (*Naylor v. Vermont Loan & Trust Company* (1898), 6 Ida. 251, 55 Pac. 298; *King v. Oregon S. L. Ry. Co.*, 6 Ida. 306, 55 Pac. 665, 59 L. R. A. 209.) Plaintiff should have been required to furnish a bill of particulars. The court undoubtedly has the power to require such a paper, either by way of a bill of particulars or amendment to the complaint, even though not specially provided for in the code, if it finds that such a procedure is necessary to the protection of the rights of the parties. (*United States v. Clawson*, 4 Utah, 34, 5 Pac. 689, affirmed in 114 U. S. 477, 5 Sup. Ct. 949, 29 L. ed. 179; *State v. Morgan*, 23 Utah, 228, 64 Pac. 356; *State v. Reed*, 3 Ida. 554, 32 Pac. 202; *Commonwealth v. Snelling*, 15 Pick. 330; *Tilton v. Beecher*, 59 N. Y. 176, 17 Am. St. Rep. 337; *Morrisett v. Wood*, 128 Ala. 505, 30 South, 631; 3 Ency. of Pl. & Pr. 523.) In this case and upon the showing made the exercise of legal discretion practically demanded that such an order be made. (*Clarke v. Ohio River R. Co.*, 39 W. Va. 732, 20 S. E. 699.) It may be urged that we should have applied for a copy of the account upon which plaintiff sues. Our view is that this is not such a

Jan. 1908.]   N. Bennett Co. v. Twin Falls L. etc. Co.   9

Argument for Appellant.

case as is contemplated by the provisions of the statute empowering us to demand an account.  (Sec. 4209, Rev. Stat.) This is not a suit upon an account, as the term is ordinarily used.  It is upon a contract for work, labor and materials. We did, under this same section, make a request that the court order a further account, to which no response was made.

Since it has been shown beyond question by the proofs that this is a state enterprise, constructed by the defendant as a contracting agent for the benefit of the state, neither the water rights nor the ditch, built as it is upon public property of the state and the United States, can be subject to a lien.  (Boisot on Mechanics' Liens, sec. 208.)  The plaintiff is not entitled to recover, and the decision is against law, because the controversies had been decided by the chief engineer pursuant to the provisions of the contract.  (*Martinsbury etc. R. R. Co. v. March,* 114 U. S. 549, 5 Sup. Ct. 1035, 29 L. ed. 255; *Spaulding v. Coeur d'Alene Ry. etc. Co.,* 5 Ida. 528, 51 Pac. 408; *Chicago etc. R. R. Co. v. Price,* 138 U. S. 185, 11 Sup. Ct. 290, 34 L. ed. 917; *Williams v. Chicago etc. Ry. Co.,* 112 Mo. 463, 34 Am. St. Rep. 403, 20 S. W. 631; *Mundy v. Louisville & N. R. Co.,* 67 Fed. 633, 14 C. C. A. 583; *Edwards v. Hartshorn,* 72 Kan. 19, 82 Pac. 520, 1 L. R. A., N. S., 1050.)  The attorney's fee is improperly allowed and is excessive.  The statute, granting to the plaintiff only if successful in a suit upon a mechanic's lien the right to recover a counsel fee, is unconstitutional, for the reason that it is partial and class legislation.

ON PETITION FOR REHEARING.

The respondent Nelson Bennett Company had not accepted the provisions of the constitution of Idaho, and hence could not recover on the contract.  In its complaint it alleged that it was at all times a foreign corporation, which had accepted the provisions of the constitution and complied with the laws of the state of Idaho relative to foreign corporations.  This was denied by the appellant, and it became the duty of the Nelson Bennett Company to prove its allegation or have its

action dismissed. The proof on this point was that the articles of incorporation were filed with the Secretary of State on August 1, 1904, which was seventeen months after the contract was entered into.

The motion made by the defendant at the trial to dismiss the case should have been allowed, as there was an entire failure of proof of an essential allegation, and more than that, affirmative proof that the cause of action rested upon a contract made and labor performed thereunder when the corporation had no standing in the state of Idaho. (*Katz v. Herrick,* 12 Ida. 1, 86 Pac. 873.)

Marshall K. Snell, Bertha M. Snell, and H. H. Henderson, for Respondents.

The measurement and classification of all this work was admittedly done by the engineers of defendant corporation, which had same in voluminous and detailed form, and it could not be surprised or unprepared. To ask for a bill of particulars in such a case is nothing more or less than asking that plaintiff plead its evidence. Facts which lie more in knowledge of opposite party need not be alleged with great particularity. (Stephen on Pleading, 4th ed., par. 4435; *Williams v. Shaw,* 4 Abb. Pr. 209; *Young v. DeMott,* 1 Barb. 30.) This court has decided that only essential facts should be stated, and those concisely. (*Lawson v. Genesee Stock Co.,* 4 Ida. 590, 43 Pac. 191; *McLean v. City of Lewiston,* 8 Ida. 482, 69 Pac. 478.) It is not alleged or attempted to be proved by appellant that this ditch was constructed on lands then belonging to the state. The patent from the United States to the state of Idaho bears date more than one year after this canal system was built (fol. 706), so that the record, if it proves anything, would indicate that title to the land across which the canal was constructed was at the time in the United States.

This court has held that a mechanic's lien attaches to a ditch built across public lands. (*Creer v. Cache Valley Canal Co.,* 4 Ida. 280, 95 Am. St. Rep. 63, 38 Pac. 653.) The supreme court of the United States has likewise held. (*Bear*

*Lake Irr. Co. v. Garland,* 164 U. S. 1, 17 Sup. Ct. 7, 41 L. ed. 327; *Garland v. Bear River Irr. Co.,* 9 Utah, 350, 34 Pac. 368.) The Carey act itself provides that the state may create a lien, and the state has provided for a mechanic's lien on property such as that involved herein.

The word "lien" as used in the Carey act and in the statute of Idaho accepting the provisions of the Carey act certainly covers a mechanic's lien as well as a mortgage lien.

Under a lien foreclosure sale of this property under our judgment, we would become subrogated to the rights of the canal company, being whatever possessory rights, whether fee simple or less, that the canal company has in and to this canal, irrigation system, and lands reclaimed thereby. This court and the supreme court of the United States have uniformly held that a contractor or laborer has a mechanic's lien on the possessory rights of a locator of a mineral claim, and if it becomes necessary for the laborer or contractor to sell out such possessory rights, then he becomes subrogated to such rights of the locator.

We allege in our complaint, and it is admitted by appellant, that it has placed two million dollars' worth of bonds upon this canal, and if this court should decide that we had no mechanic's lien, which is superior to these bonds, it would work an irreparable hardship, for we cannot now be relegated to an action at law. (3 Farnham on Waters and Water Rights, p. 1995; *Garland v. Bear Lake,* 9 Utah, 350, 34 Pac. 368; 164 U. S. 1, 17 Sup. Ct. 7, 41 L. ed. 327; 20 Am. & Eng. Ency. of Law, 2d ed., 297; 2 Jones on Liens, sec. 1257; Phillips on Mechanics' Liens, sec. 188.)

*Springer Land Assn. v. Ford,* 168 U. S. 513, 18 Sup. Ct. 170, 42 L. ed. 562, holds in substance: That a mechanic's lien law creates a lien not only on the canal and right of way, but also on the land reclaimed.

An agreement to arbitrate must be binding upon both parties or it is binding upon neither. (Wait's Engineering, secs. 445-460.) Such awards have been set aside where it was shown that the engineer, who acted as umpire, was incompetent, or biased, or that he did not avail himself of sufficient

opportunities for observation, or where he relied on the judgment of subordinates. All of these elements enter into the case at bar. (*Spaulding v. Coeur d'Alene Ry. Co.,* 5 Ida. 528, 51 Pac. 408; *Davis v. King,* 50 Am. St. Rep. 114, note.) Arbitration clause is not fulfilled where engineer refuses to look into the matter of dispute. (*Van Hook v. Burns,* 10 Wash. 22, 38 Pac. 763; see, also, *Edwards v. Hartshorn,* 72 Kan. 19, 82 Pac. 520, 1 L. R. A., N. S., 1050.)

AILSHIE, C. J.—This is an appeal from the judgment and an order denying a motion for a new trial. The Nelson Bennett Company, a Washington corporation, in the month of March, 1903, entered into a contract with the Twin Falls Land & Water Company, a Utah corporation, whereby the former agreed to construct about thirty-eight miles of canal for the appellants in the counties of Lincoln and Cassia on the south side of the Snake river, and which is now commonly called the Twin Falls canal. After the work was completed, the Nelson Bennett Company filed a lien against the canal and all the property connected therewith belonging to the Twin Falls Company to secure its claim for the balance due in the sum of $185,705.62. About the same time liens were filed by subcontractors; one by Alexander Toponce and one by Ryberg & Carlson. The Nelson Bennett Company commenced an action to foreclose the lien, as did also Toponce, but it seems that Ryberg & Carlson have never prosecuted any action for the foreclosure of their lien—at least they never sought to do so in this action. At the time of the trial an order was made for the consolidation of the Nelson Bennett case and the Toponce case, and the action was thereafter prosecuted in the name of the two plaintiffs. The defendant and appellant answered, denying the material allegations of the complaint and also pleading special matters in defense. The case went to trial and resulted in a judgment in favor of plaintiffs for the sum of $162,211.26.

The questions presented on this appeal have involved the examination of a voluminous record and exhaustive briefs. In order to a proper understanding of the questions that must

be determined on this appeal, it is necessary to recite the relation of the respective parties to the property on which the lien is sought and some of the transactions which led up to the status they occupied at the time of entering into this contract and of the rendition of judgment thereon. On January 2, 1903, the appellant corporation entered into an agreement and contract with the state of Idaho, the latter acting through and by the authority of its state board of land commissioners, whereby the company undertook to build a dam across Snake river and construct a system of main and lateral canals in the counties of Lincoln and Cassia, sufficient in capacity for carrying water to irrigate a tract of about 270,000 acres of land lying under such system of canals. The contract was entered into by the state board of land commissioners under authority of the act of the legislature approved March 2, 1899 (Sess. Laws, 1899, p. 282), entitled "An act to provide for a state engineer, defining his duties and regulating his compensation, and to provide for the acceptance by the state of Idaho from the United States of certain lands, and to provide for the reclamation, occupation and disposal of the same." By the provisions of the foregoing act, the legislature provided for an acceptance of the terms of the act of Congress commonly known as the Carey act (6 Fed. Stat. Ann., pp. 396-398, U. S. Comp. Stat. 1901, pp. 1552-1554), and prescribed the means, manner and method by which the state might avail itself of any part of the million acre grant made by the Carey act and acts of Congress supplemental thereto. It will be seen that the legislature of this state did not authorize the state, or any board of commissioners under the state, to construct and erect these works, but it rather authorized the state to contract with individuals, associations or corporations for doing such work. An examination into the character and extent of the appellants' interest in this property and these works is at once suggested by reason of the contention that it makes to the effect that a mechanic's lien cannot be maintained against this property. The Land & Water Company has argued with much force and earnestness that it has no lienable interest in this property;

that the entire property belongs to the state of Idaho and to the United States—that the canal system and the water and the entire works belong to the state of Idaho, and that the lands to be irrigated principally belong to the United States. Appellants contend that the only interest they have is that they may do this work and receive their pay, and that the law does not permit a lien either against the state or the general government.

By sec. 20 of the act of the legislature of 1899, the person, company or association which secures the contract for the construction of a canal system and for the reclamation of arid lands under the Carey act is given a "prior lien on said water right and land upon which said water is used for all deferred payments for said water right." This provision of the legislative act granting to the contractors or construction company a lien is authorized by and is in harmony with section 1 of the sundry civil appropriation act of Congress of June 7, 1896 (6 Fed. Stat. Ann., p. 398, U. S. Comp. Stat. 1901, p. 1556), which authorizes the state to create a lien "for the actual cost and necessary expense of reclamation," etc., under the Carey act.

By the provisions of the statute and the contract entered into thereunder, the appellant herein acquired the right to construct the system of canals and ditches covering this tract of land and the right to divert the necessary amount of water from the Snake river for the irrigation of such lands. It likewise acquired a right to charge and collect from each and every settler the sum of $25 per acre for a water right, and to have the same become an immediate and continuing lien upon the lands to be irrigated. It acquired a right of way for the ditches and canals, and also an additional strip of land not exceeding fifty feet in width along the main canal and thirty feet along the laterals as a right of way for working, inspection and improvement purposes, and the right to increase or enlarge the canal at any time it might see fit or proper to do so for the purpose of carrying any additional waters either for its own use or purposes or for that of rental and distribution, and the right to the use of any sur-

plus water that might be carried in the canal and not needed°
for the purpose of irrigating the lands in this segregation.
Under its contract and the statute (sec. 19 of amendatory act
approved March 18, 1901,  Sess. Laws, 1901, p. 198), it se-
cured the additional right to acquire title absolute from the
state of Idaho to any and all lands contained in the segrega-
tion not applied for or taken by settlers within two years
after the final completion of the ditch and irrigation works.
It also acquired a right of indefinite possession and control
of the system and authority to charge and collect additional
rates from the water consumers not to exceed eighty cents per
acre per annum, and to become a stockholder in the settlers'
and consumers' company that was to be formed for the pur-
pose of eventually taking over the management of the canals.

The foregoing are some of the numerous rights and inter- ·
ests we find provided and stipulated for in the contract en-
tered into between the appellant corporation and the state.
As to the legal effect of these various stipulations and pro-
visions and the extent of the rights, title and interest ac-
quired by the appellant corporation under˙ them, we express
no opinion, nor are we required in this case to determine
their extent or character beyond that of ascertaining whether
they are sufficient on which to found or rest a mechanic's
lien.   That the Twin Falls Land & Water Company had,
and still has, an interest in this canal system and the lands
thereunder and the waters appropriated for their irrigation
and reclamation, and that under the statutes and decisions
of this state such property rights are real estate, there can
be no doubt.   (Rev. Stat., sec. 2825; *Welch v. Garrett*, 5
Ida. 639, 51 Pac. 405; *Ada Co. etc. v. Farmers' etc. Co.*, 5
Ida. 793, 57 Pac. 990; *Hard v. Boise City Irrigation & Land
Co.*, 9 Ida. 589, 76 Pac. 331, 65 L. R. A. 407.)

Under sec. 1 of the Mechanic's Lien Law of this state
(Sess. Laws, 1899, p. 147), ''Every person performing labor
upon or furnishing materials to be used in the construction,
alteration or repair of any . . . . ditch, dyke, flume . . . .
has a lien upon the same for the work or labor done or ma-
terials furnished,'' etc.   The statute further provides that

the contractor, subcontractor, architect, builder, or any person having charge of the construction, alteration or repair shall be deemed the agent of the owner for the purposes of this chapter. In this case there is no contention made that the lien claimant can acquire any greater right or interest under its lien than that owned and possessed by the Twin Falls Land & Water Company. It should be borne in mind, however, that under the act of Congress and the state statute above cited, both the general government and the state legislature have granted the right of lien upon the lands to be irrigated to any person, association or corporation taking a contract from the state to the extent of ''the actual cost and necessary expenses of reclamation.'' The act of the legislature, in conformity with the act of Congress, has granted a lien to ''any person, company or association furnishing water for any tract of land,'' for the expense of the construction of the works, or rather to the extent of the price allowed to be charged for the water right for each acre of land. Under this enactment of the state legislature, it is clear to us that the contractors and subcontractors under a construction company like the appellant would be entitled to avail themselves of the benefit of the lien laws of the state, and that in case of foreclosure and sale under the lien they would be entitled to sell all the right, interest and claim of the construction company, and that the purchaser at such foreclosure sale would be subrogated to all the rights, interests and privileges of the construction company therein. If it be conceded by appellant that it has no interest in or title to any of this property, and no right of possession thereto, then we grant that the respondent can sell nothing at a foreclosure sale. This lien extends only to the interest, claim and right of the Twin Falls Land & Water Company. If it has no interest therein, it cannot suffer by a foreclosure sale under this lien. If it has an interest therein, that interest may be sold at foreclosure sale. The appellant is not the representative of either the state of Idaho or the general government, and is in no position to present the interests of either here, and cannot complain for or on account of any pretended claim that may be preferred against

Jan. 1908.]   N. Bennett Co. *v.* Twin Falls L. etc. Co.   17

Opinion of the Court—Ailshie, C. J.

either.   In fact, however, the claim here made is only commensurate with the interests and rights of the appellant company.   To that extent the action may be prosecuted and no further.   (Sec. 4, Lien Law, Sess. Laws 1899, p. 148.) Miners, by discovery and location, acquire only a possessory right to mining claims, while the fee remains in the government, yet they may go ahead and expend thousands of dollars in running tunnels, sinking shafts and making other improvements thereon, and the contractors, laborers and materialmen who have engaged in such work are entitled to a lien on the mine or mining claim for such labor or material, and we know of no court that has refused to allow the lien because the fee was in the general government or that the miner had nothing but a possessory title.   On the contrary, the courts have uniformly allowed the lien claimant to foreclose his lien and sell the property, and the purchaser has been recognized as having acquired all the interest that the locator and possessor of the claim had at the time of preferring the lien and foreclosing the same.

Many cases may be found where the courts have held that liens preferred against property where the party who employed the laborers or made the contract or purchased the material had only a right of possession or a leasehold interest, would extend to all the rights, interest and claim the employer or purchaser had in or to the property.   In *Badger Lumber Co. v. Malone,* 8 Kan. App. 692, 54 Pac. 692, the court of appeals of Kansas in discussing this question said: "We conclude the law to be that a mechanic's lien affects whatever estate or interest in the land upon which the building is erected is owned and possessed by the person who causes the erection of the building at the time when the contract is made for the material.   And if the person contracting to have the building erected has any estate or interest in the land upon which it stands, the lien of the materialman who furnishes the material extends to the whole of that estate or interest, whatever it may be.   The word 'owner' is not limited in its meaning to an 'owner in fee,' but includes also an owner of a leasehold or other estate.   It therefore follows that the estate pos-

sessed by the builder, whatever its extent may be, in the land, is subject to a mechanic's lien, and may be sold." To the same effect see 3 Farnham on Water and Water Rights, p. 1995; *Garland v. Bear Lake Co.,* 9 Utah, 350, 34 Pac. 368; same case, 164 U. S. 1, 17 Sup. Ct. 7, 41 L. ed. 327; *Jarrell v. Block* (Okl.), 92 Pac. 167; 20 Am. & Eng. Ency. of Law, 2d ed., 297.

Having determined that the plaintiffs were entitled to liens and were pursuing the proper remedy, we now pass to the consideration of the further questions that were raised and are presented here.

The defendant filed a special demurrer to the complaint on the grounds of ambiguity and uncertainty, and pointed out specifically numerous instances in which it claimed the complaint was too indefinite and uncertain to enable it to properly answer or go to trial. At the same time defendant filed a motion based on the grounds designated in the demurrer, and moved the court to require the plaintiff to furnish it with a bill of particulars. The demurrer and motion came on for hearing and the demurrer was overruled and the motion denied. The defendant thereafter answered. It now assigns the action of the court in overruling the demurrer and denying the motion as error. The chief ground relied upon by the appellant is that since the measurements of the amount of work done and the estimates and classifications thereof were by the contract to be left to the appellant's chief engineer, and in pursuance thereof the engineer had made the measurements, estimates and classifications and the respondent claimed that they were unfair, fraudulent and incorrect, and that in truth and in fact the classifications should be very different from those made, the court should have required the respondent to point out the particular place or places along the line of the works and the particular stations, sections or subdivisions where these errors and mistakes and fraudulent estimates had been committed, and the particulars on which it relied for a recovery so as to enable appellant to properly answer and to prepare its case for trial. The respondent constructed about twenty-two miles of the main

canal.   This canal was 80 feet wide at the bottom and 120 feet wide at the top.   In its construction the contract contemplated that it would be necessary to remove all kinds of material from that of loose earth to solid rock, and accordingly it enumerated a number of classifications such as solid rock, loose rock, common material (earth that could be plowed with six horses), and earth or other material that could not be plowed with that number of horses.   The allegations of the complaint involved in this consideration are paragraphs 6 and 9 thereof, which are as follows:

"6. That plaintiff proceeded under said contract and employment, and in good faith completed and fulfilled said contract on its part; and did between the dates of March 9, 1903, and the 6th day of August, 1904, perform and furnish work, labor and material in the construction of said canal, ditch dams, adjuncts and irrigation system and works, as follows:

| | |
|---|---:|
| 482.85 acres cleared at $10 per acre.............$ | 4,828.50 |
| 70,732 cubic yards solid rock at 90 cts........... | 63,658.80 |
| 455,569 cubic yards loose rock and hard-pan at 45 cts. per cubic yard ...................... | 205,006.05 |
| 1,632,568 cubic yards common material at 13 cts. per cubic yard ......................... | 212,233.84 |
| 499,172 cubic yards over-haul at 2 cts. per cubic yard, per 100 feet ...................... | 9,983.44 |
| 28,256 feet bridge timber at $42 per M.......... | 1,186.75 |
| 336 acres bond-plowing at $3.00 per acre........ | 1,008.00 |
| 2 Pettelo cars furnished at $50 each............. | 100.00 |
| 184,551 cubic yards of embankment at 27 cts. per cubic yard..... ......... ................. | 49,828.77 |
| 9,789 yards of rip-rap at $1.25 per yard......... | 12,236.25 |
| 167 days pumping at $5.00 per day............. | 835.00 |

Amount to the sum of.............$560,905.40

"9. That according to the terms of the contract between plaintiff and defendant canal company, the amount and classification of the work done under said contract, said plaintiff was to be governed by the rules, regulations and restrictions

and specifications of the engineers in charge of said work, which said engineers were in the employ of said defendant canal company. That the said defendant canal company and its said engineers fraudulently and arbitrarily and without having made actual or correct measurements and without having made proper inspection of the same, and without sufficient knowledge upon which to found an honest judgment in respect either to the proper measurements or the amount of cubic yards excavated or the classifications of the same as to earth, loose rock, solid rock, hard-pan, and of the other work done, and with intent to injure and defraud this plaintiff and to deprive it of the just amount of compensation due for said work and material as aforesaid, the said defendant canal company and its engineers arbitrarily and in violation of good faith and duty, did make or cause to be made false and untrue final estimates, so called, or calculations and certificates of the amount or kind of work done by the plaintiff. That said estimates and calculations and certificates of the kind of work done by said plaintiff, as made by the defendant canal company and its engineers, were false and untrue in this, to wit: That according to the estimates made by said defendant canal company and its engineers, they allowed and furnished estimates to plaintiff for solid rock in the amount of 33,214 cubic yards, at the rate of ninety cents per cubic yard, when in truth and in fact there were 70,732 cubic yards of solid. rock, at the same price. That according to the estimates and classifications made by said defendant canal company and its engineers, they allowed for loose rock and hard-pan in the amount of 101,394.3 cubic yards, at the rate of forty-five cents per cubic yard, when in truth and in fact there were 455,569 cubic yards of loose rock and hard-pan, at the same price. That according to the estimates and classifications made by the said defendant canal company and its engineers and as furnished defendant canal company, they allowed for overhaul 249,585.5 cubic yards, at the rate of two cents per cubic yard, while in truth and in fact there were 499,172 cubic yards at the same price. That the said defendant canal company did knowingly, intentionally, and with an intent to

cheat and defraud plaintiff, order and direct in the performance of its said contract that it perform and plow 336 acres of bond-plowing, for which plaintiff was to receive, and should have been allowed and received, the sum of $3 per acre. That said defendant canal company neglected and refused to allow said plaintiff anything whatsoever for said bond-plowing, and have never made any allowance therefor. That the defendant canal company did take and appropriate and use for its own use and benefit in the construction of said canal two Pettelo grading cars of the value and price of $50 each, which cars were reasonably worth and were worth at said time the sum of $50 each, or $100. That said defendant canal company neglected and refused, and have always and still do neglect and refuse, to pay or allow plaintiff for said cars, although demand has been made for the payment of same. That the said defendant canal company, although ordering and directing that the plaintiff perform and furnish for its use and benefit in the puddling of its said dam while under construction 167 days pumping of water, at the sum of $5 per day; that said services performed by plaintiff for said canal company in pumping of said water were reasonably worth and were worth the sum of $5 per day, which said defendant canal company promised and agreed to pay, but that they have neglected and refused, and do still neglect and refuse, to pay said pumping as heretofore set forth, or any part thereof. That according to the estimates and specifications made by the said defendant canal company and its engineers, which were furnished to plaintiff, they allowed for 8,873 yards of rip-rap, at the rate of $1.25 a yard, when in truth and in fact there were 9,789 yards at the same price. That according to the estimates and specifications made by the said defendant canal company and its engineers, which were furnished to plaintiff, they allowed for 160,273 cubic yards for embankment and construction of its dam and canal, at the price of twenty-seven cents per cubic yard, when in truth and in fact there were 184,551 cubic yards, at the same price. That in respect to the above enumerated items and estimates; calculations and computations as made by said defendant

canal company and its engineers, they were false and untrue
and grossly incorrect, and were arbitrarily made for the pur-
pose of cheating and defrauding and depriving this plaintiff
of the amount justly due to it for work performed under and
in pursuance of said contract."

It will be seen from these allegations that the plaintiff in
every instance gave the classification and number of cubic
yards thereunder that had been allowed by the appellant's en-
gineer, and also gave the number of cubic yards and classifi-
cations it contended was correct and that it should have re-
ceived. The controversy and difficulty is therefore reduced
to this: Was it necessary for the plaintiff, where it claimed
70,000 cubic yards of solid rock, when in fact the engineer's
estimate had only given it 33,000 cubic yards, to state in its
pleading or bill of particulars the particular point or points,
station or stations, along the line of work at which it should
have received increased estimates or different classifications;
or, for instance, where it had only received an estimate of 100
cubic yards when it should have had 125 cubic yards in any
given distance of the canal. It should be borne in mind, too,
that the appellant company had on file all the figures, esti-
mates, classifications and records of its engineers showing the
amount of excavation and work done along the entire length
of this canal and the number of cubic yards removed for every
100 feet thereof. It is further worthy of note that there was
no material difference between the appellant and respondent
as to the total number of cubic yards of material handled in
the construction of this canal with the exception of one piece
of work known as the Dry creek dam. The principal contro-
versy arose over the classifications given the respondent by
the appellant's engineer. For example, the appellant only
allowed respondent for 101,394.3 cubic yards of loose rock and
hard-pan, while the respondent claimed that it should have
had an estimate of 455,569 cubic yards of loose rock and hard-
pan. On the other hand, the engineer's estimate of common
material was much larger than respondent claims it was en-
titled to—this difference arising out of the fact that he had
not given large enough estimates of the more expensive classi-

Jan. 1908.]    N. Bennett Co. v. Twin Falls L. etc. Co.    23

Opinion of the Court—Ailshie, C. J.

fications, and too large an estimate on the cheaper classifications. When the defendant company came to answer, it relied upon its engineer's estimates and classifications, and denied that any error, mistake or fraud had been committed by him and asserted the correctness of his estimates and classifications and relied thereon. It is therefore difficult to see just how or wherein the appellant has been injured or prejudiced by the ruling of the court in overruling its demurrer and denying its motion. (*Dennis v. Crocker-Huffman Land & Water Co.*, 6 Cal. App. 58, 91 Pac. 427.) We do not think the complaint was open to demurrer on the grounds of ambiguity or uncertainty. Under sec. 4209, Rev. Stat., in dealing with "general rules of pleading," a plaintiff is relieved from the necessity of pleading its items of an account, but must deliver to the adverse party a copy of the account within ten days after written demand therefor or be precluded from introducing evidence thereon. That section might be held to cover a case of this kind, but if it does, it may then be said that the complaint in this case contained a statement of each item, or rather of the number of cubic yards under each classification and the compensation claimed therefor. On the other hand, we have no statute providing for the ordering "bills of particulars." The appellant does not appear to have relied upon the provisions of the foregoing statute or pursued the remedy there pointed out, but rather applied to the court for an order requiring respondent to furnish a "bill of particulars," and for the relief sought relied upon the general and inherent powers of courts of justice to control their proceedings and regulate the conduct of trials and to require the information that may be obtained by means of such statements or bills of particulars. (*United States v. Clawson*, 4 Utah, 34, 5 Pac. 689; same case, 114 U. S. 477, 5 Sup. Ct. 949, 29 L. ed. 179; *Commonwealth v. Snelling*, 15 Pick. (Mass.) 330.) We have no doubt of the power of the court in the exercise of a sound discretion to order bills of particulars in proper cases. (3 Ency. of Pl. & Pr. 523; *Tilton v. Beecher*, 59 N. Y. 176, 17 Am. Rep. 342.) We are satisfied, however,

24   N. Bennett Co. *v.* Twin Falls L. etc. Co.   [14 Idaho,

Opinion of the Court—Ailshie, C. J.

that there was no abuse of discretion in denying the motion in this case.

It is next urged by appellant that the court erred in refusing to give effect to the "contract provision giving engineer of defendant right to decide upon disputed questions"; and further, that "the controversies have been decided by the chief engineer pursuant to the provisions of the contract." The provision of the contract involved in these assignments is as follows:

"ENGINEER AS UMPIRE.—1.   To prevent all disputes and misunderstanding in relation to any of the stipulations contained in this agreement or their performance by either of said parties, the said engineer shall be and hereby is made umpire to decide all controversies arising or growing out of this contract, and his decision on any point or matter touching this agreement shall be final and conclusive between the parties.   And it is further agreed between said parties that wherever the word 'Engineer' is used it shall be taken and construed to mean Chief Engineer employed by said second party."   Respondent in the first place urges that there are two reasons why this provision of the contract was ineffectual. 1. That it is so general and sweeping that it amounts to an attempt by contract to oust the courts of jurisdiction, and in support thereof cites Waite Eng. & Arch. Juris., sec. 406, p. 340; 2 Am. & Eng. Ency. of Law, 2d ed., 570; *Louisville Ry. v. Donevan,* 111 Ind. 179, 12 N. E. 153; *Wood v. Chicago Ry. Co.,* 39 Fed. 152.   See, also, *Baltimore etc. Co. v. Scholes,* 14 Ind. App. 524, 43 N. E. 156, 56 Am. St. Rep. 307, and note.

The second objection is that the contract under consideration reserved to the Land & Water Company the right to question the estimates of the engineer both as to "amount and character of the work," etc.   That provision of the contract is embodied in paragraph 3 thereof, and is as follows:

"TRUE ESTIMATES.—Said second party shall not be estopped by any estimate by its engineer from showing at any time the true and correct amount and character of the work which shall have been done and materials which shall have been fur-

nished by said first party or by any person under this agreement.''

In the first place, it would seem that the stipulation constituting the chief engineer as umpire could not, and perhaps would not, receive a construction by the courts that would give to the engineer ''the determination of questions relating to the meaning and interpretation of the contract itself,'' and would rather limit his determinations to estimates, classifications, character of work,'' etc., provided by the contract to be done and performed. (Waite Eng. & Arch. Juris., sec. 408, p. 342.) It is clear to us, on the other hand, that a stipulation in a contract requiring the submission of any given questions or controversies to an engineer as umpire, in order to be binding upon one party must be made obligatory on the other, and in so far as it is made inoperative by the contract against one party, it will be held inoperative by the courts as against the other. If this point, however, were conceded in favor of appellant, there is another and equally serious reason why the courts will go back of the findings of the engineer in this case and that reason we will consider presently.

As will be seen from an examination of paragraph 9 of the complaint above quoted, the issue tendered was that the ''canal company and its said engineers fraudulently and arbitrarily and without having made actual and correct measurements and without having made proper inspection of the same, and without sufficient knowledge upon which to found an honest judgment in respect either to the proper measurements or the amount of cubic yards excavated or the classifications of the same . . . . and with intent to injure and defraud this plaintiff and to deprive it of the just amount of compensation due . . . . its engineers arbitrarily and in violation of good faith and duty, did make or cause to be made false and untrue final estimates,'' etc. In contracts for this character of work, stipulations for the submission of questions of difference and controversies to the decision of the chief engineer on the works have been generally sustained and enforced. (Waite Eng. & Arch. Juris., sec. 433; *Chicago etc. R. R. Co. v. Price*, 138 U. S. 185, 11 Sup. Ct. 290, 34 L.

ed. 917; *Davis v. King,* 50 Am. St. Rep. 114, and note; *McCoy v. Able,* 131 Ind. 423, 30 N. E. 528, 31 N. E. 453; *Baltimore etc. Ry. Co. v. Scholes,* 14 Ind. App. 524, 56 Am. St. Rep. 310, 43 N. E. 156.) But where it has been shown that the engineer was biased against one of the parties to the contract and declined to make honest estimates and decisions or refused to make inquiries or inform himself as to the facts in dispute, or as to the condition of the matters or works he was to determine upon or the nature of the work or classification to which it belonged, or where he was utterly incompetent and unfit for the discharge of the duty or acted fraudulently or acted wholly on information received from other parties, the courts have furnished relief to the injured party. (*Spaulding v. Coeur d'Alene Ry. Co.,* 5 Ida. 528, 51 Pac. 408; *Davis v. King,* 66 Conn. 465, 50 Am. St. Rep. 104, 34 Atl. 107; *Edwards v. Hartshorn,* 72 Kan. 19, 82 Pac. 520, 1 L. R. A., N. S., 1050; *Martinsburg etc. Potomac R. R. Co. v. March,* 114 U. S. 549, 5 Sup. Ct. 1035, 29 L. ed. 255; *Williams v. Chicago etc. Ry. Co.,* 112 Mo. 463, 34 Am. St. Rep. 403, 20 S. W. 631; *Mundy v. Louisville & N. R. Co.,* 67 Fed. 633, 14 C. C. A. 583; *Baltimore etc. Ry. Co. v. Scholes,* 14 Ind. App. 524, 56 Am. St. Rep. 307, and notes, 43 N. E. 156.)

Upon the issues made on this point the court found "That the said chief engineer wrongfully, arbitrarily, and without having made proper examination, inspections and tests, and without having made proper observations, and without sufficient knowledge upon which to found a just judgment in respect to the kind, quality and classification of materials, and in violation of good faith and duty, did make, cause to be made and permit untrue and grossly erroneous estimates and classifications of the kind, character and amount of materials removed and placed, and work done, by said plaintiff. The said chief engineer in arriving at his conclusion based his judgment almost entirely upon reports made to him by his subordinates, and without any due or proper examination made by him to verify these reports. That the reports of the subordinates were grossly incorrect and untrue." It is argued by appellant that this finding is not sufficient to justify or

support a judgment against the Land & Water Company setting aside the final estimates and classifications made by the engineer and going back of such estimates and classifications. That it is insufficient for the reason that it does not directly find the engineer or the company guilty of fraud or dishonesty in the matter of the estimates and classification. It has been established in this state that "the appellate court will give to the findings of the trial court the most liberal construction the language used will permit in order to sustain a judgment founded thereon." (*Eastwood v. Standard Mines & Milling Co.*, 11 Ida. 195, 81 Pac. 381.) It is also well settled that findings of fact made by the trial court are not required to conform to all the niceties and rules governing the pleadings which go to form the issues under which the findings are made. Here the court finds that the engineer made and caused to be made estimates and classifications "wrongfully" and "arbitrarily," and that he did so in "violation of good faith and duty," and that he caused and permitted "untrue and grossly erroneous" estimates and classifications, and that he based his judgment upon "grossly incorrect and untrue" reports made to him by his subordinates, and without due or proper effort to verify their correctness. It seems to us that there can be but little room for doubt that the findings of the court on these issues were sufficient to support the judgment entered thereon.

Pursuing this contention, however, appellant contends that the facts before the court were not sufficient to justify these findings and warrant the court in going back of the estimates and classifications made by the engineer. As stated by appellant in its brief, "The great controversy in the case, as to which the greater amount of testimony was given, was over that part of the specifications, Exhibit 'A,' which classified loose rock and hard-pan." The chief engineer had allowed the Nelson Bennett Company for 101,394.3 cubic yards of "loose rock and hard-pan" at forty-five cents per cubic yard, while the plaintiff contended that it was entitled to an allowance of 455.569 cubic yards of "loose rock and hard-pan," at the price above stated. It seems to have been conceded by

counsel and assented to by the court, that there is a sheet of hard-pan extending throughout that entire section of country varying in depth below the surface. The parties to the contract had this fact in view and stipulated therein for the classification of "hard-pan" as common excavation where it "can be plowed with a ten-inch grading plow behind a team of six good horses properly handled," and for its classification as loose rock where it "cannot be plowed with a ten-inch grading plow behind a team of six good horses properly handled." The controversy and evidence necessarily revolved about the issue as to whether this stratum of "hard-pan" could be plowed with a ten-inch grading plow drawn by a team of six good horses properly handled. The record contains some hundreds of pages of evidence on this point. To review it in this opinion would be out of the question and useless. It is sufficient to say that the great preponderance of evidence on this point goes to sustain the contention made by the plaintiff and the finding of the court. It was shown that most of this work was done with eight and ten horses, and in some instances with smaller plows than that prescribed in the contract and specifications. In a few instances the appellant succeeded in showing that subcontractors had plowed with four and six horses, but in those cases the plows were much smaller than that mentioned in the contract, and in those cases the plaintiff showed that the plowing was not successful and not up to the standard of ordinary plowing.

Appellant also urges that the evidence was not sufficient to warrant a finding and conclusion that the engineer acted either fraudulently, arbitrarily or dishonestly or without honest inquiry and investigation or without sufficient information to enable him to make honest and true estimates. The appellant's chief engineer was a Mr. Bickel, under whose charge were a number of assistant engineers. It is conceded that the larger part of the Nelson Bennett contract was examined and superintended by an assistant engineer named Shobert. It is also apparent from the record that Bickel received practically all his information, reports, estimates and classifications from Shobert. Differences arose between the Nelson Bennett

Company and the Land & Water Company at an early stage in the progress of this work over the treatment the contractor and subcontractors were receiving from the employees of the Land & Water Company, and especially from the engineers. Mr. Bennett complained of the conduct of the assistant engineer Shobert, charging him with being prejudiced against him and with wanting to "do him." As an illustration of the feeling of animosity existing, we quote the following from the testimony of Mr. Bennett: "I called Shobert over and talked quite a while with him. I said, 'Shobert, why do you want to do me? What is the matter with you?' He says, 'Well, you ought to know why I want to do you,' he says, 'You got me discharged off the Northern Pacific Railway.' I said, 'Bill'— I called him Bill because that was his nickname; I believe that is his name; we so call him—I says, 'Bill, you are entirely mistaken; I cannot see how you arrived at any such conclusion.' He told me what his authority was, that it was the chief engineer of the Northern Pacific Railroad told him, Mr. Darling. I told him if Darling said anything of that kind he was mistaken, and there was a good deal of feeling in the matter. He says, 'I don't believe a word of it, I don't believe Darling would say that unless it was true.' He says 'You got me fired off there and I don't see why you should expect anything from me.' I told him I didn't expect anything from him except justice, and I was going to try to get that, and I told him again that there was absolutely and unqualifiedly no reason for any statement that I got him fired from the Northern Pacific; on the contrary, I was always your friend. I found there was no use talking to him about it; he had got it firmly fixed and was going to do me injury. I went back to Milner and saw the chief engineer and called his attention to this matter. I saw Bickel in regard to this conversation with Shobert, the animosity he had expressed toward me. I explained to Bickel the conversation I had had with Shobert and Shobert's answer to me. I said, 'Now, Mr. Bickel, it seems to me there should be something done in these premises, that it is not fair to myself nor fair to these subcontractors who have to be punished if I am to keep a man

over my work that expresses himself as having a desire to do me or to injure me, and he having such an opportunity to do it as to classify and return my estimates.' He asked me what I wanted him to do with him. I said, 'I don't want you to discharge him. You have plenty of work off my work; there is work below; location of that immense ditch and laterals. You could easily change him for one of the engineers of Faris-Kesl or you could put him below.' He got up and said, 'The very fact that you want me to discharge him is evidence that you did get him discharged off the Northern Pacific. I will tell you right now that I will not discharge him for you.' I said, 'All right, Mr. Bickel, I cannot help it; it is wrong.' In the fall, later on, I had another conversation with Mr. Shobert in regard to his feeling toward me.'' Later on Bennett had another conversation with Shobert in which there appears to have been considerable feeling manifest and wherein Shobert informed Bennett that he intended to make him and his subs hew to the line, and that he was going to do him up if he could. There seems to be no question about this conversation taking place, and, indeed, about this feeling existing. For a chief engineer and a corporation for which he was working to retain the services of a man under such circumstances and with knowledge of the feeling existing and permit him to fraudulently act as umpire in the settlement of differences and disputes and the making of estimates and classifications, is in itself sufficient evidence of fraud and injustice to warrant any court in going back of his estimates and classifications and see that honesty and fair dealing is enforced. It was specifically stipulated in this contract that the word ''engineer'' should mean the ''chief engineer'' employed by the Land & Water Company. It is true that in extensive works such engineer cannot measure every yard of earth and material moved and classify the same personally, and that he must in some measure rely upon information derived from other sources. (*Sweet v. Morrison*, 116 N. Y. 31, 15 Am. St. Rep. 376, 22 N. E. 276; *Pilmer v. Clark*, 107 Mass. 373.) On the other hand, ''the decision to be conclusive must be a result of the deliberate and fair judgment of the engineer.'' (Waite Eng. &

Jan. 1908.]   N. Bennett Co. v. Twin Falls L. etc. Co.   31

Opinion of the Court—Ailshie, C. J.

Arch. Juris., secs. 433-503.)   The decision of the questions which arise and require the exercise of a judgment of a *quasi*-judicial character cannot be delegated by the chief engineer or umpire to anyone.   The parties in this case have agreed to abide the deliberate and fair judgment of the "chief engineer."   In order for him to fairly, honestly and justly exercise that judgment, it was necessary for him to hear the facts and to take such steps as would enable him to come into possession of the facts in controversy or on which his judgment and decision depended.   Such was not done.

The contract provided for any additional work, changes or alterations that might be ordered by the Land & Water Company or its chief engineer, and for the classification thereof and payment therefor in the same manner and under the same rules and regulations as set out in the contract and specifications for the main work.   In the course of the construction of this canal, the company decided to have a dam built across what is called Dry creek, and which dam is referred to throughout the case as Dry creek dam.   No special contract nor plans nor specifications were drawn for this piece of work.   The dam was about one mile long at the top.   A difference arose between the Nelson Bennett Company and the engineer over the measurements of this work.   The engineer allowed 160,273 cubic yards as his measurement.   The court, after hearing the evidence, allowed 184,551 cubic yards. Small differences and disputes arose over other pieces of work and extras and additional work; among those items was that of "rip-rapping" and "bond-plowing."   Without going into a consideration of the evidence on these items and charges, we are content to dispose of them by saying that there is sufficient evidence in the record to justify the findings and conclusion of the court on each of them.

Appellant assigns as error that the court made excessive allowances, and that the total allowances made by the court under the various classifications amounted to some 38,000 cubic yards more than was contained in the works and was actually moved.   It seems that respondent originally proceeded on the theory that the measurements made by the

Land & Water Company were in the aggregate correct except as to those on the Dry creek dam, and that the chief error was in the classification of the different material contained in the grand total. After the court had heard the evidence and made up its findings, he concluded, among other things, that as a matter of fact 78,948 cubic yards of solid rock had been removed, but since a lien had only been claimed for 70,732 cubic yards, the plaintiffs were only allowed to recover for the latter amount. On the Dry creek dam embankment he found that there had actually been removed 208,992 cubic yards, while the lien filed only claimed for 184,551, and the plaintiff was allowed to recover only to that extent. At the trial the Twin Falls Land & Water Company presented the measurements, estimates and classifications made by their chief engineer and relied upon them. They showed a total of 2,178,142.9 cubic yards of material as having been removed. The plaintiffs, in order to establish their case, had secured the services of an engineer named Bostaph, who went over the whole works and made tests and measurements, and he produced his measurements and computations in court and testified concerning the whole works covered by the transaction. His figures disclosed a total of 2,236,757.9 cubic yards of material as having been handled. The difference between the totals furnished by the two engineers was some 58,000 cubic yards. There was a difference of over 48,000 on the Dry creek dam alone, on which it was never admitted that the chief engineer's figures were correct. In the course of the trial the company admitted, apparently, several items of discrepancies, something over 1,000 yards on the Dry creek dam and some 1,680 yards removed on the first forty feet of the plaintiff's contract. After all the allowances are made for corrections, it seems that the difference in the figures is upward of 3,000 cubic yards. Respondents admit in their brief that after making all the additions and corrections to the figures made by the engineer of the appellant company, as admitted by the pleadings or upon the trial, the total number of cubic yards as allowed by the court in its findings exceeds the total measurements made by the company as shown by

Jan. 1908.] N. Bennett Co. v. Twin Falls L. etc. Co. 33

Opinion of the Court—Ailshie, C. J.

its figures in the sum of 3,162.2 cubic yards. The Nelson Bennett Company's engineer, Bostaph, who made the tests, measurements and computations for the plaintiff, testified that his total estimates were within seventeen hundredths of one per cent of the total estimates made by the company, and that on a work of the magnitude of this, it would be very difficult to make a closer calculation than that. He also testified that his total estimates were substantially the same as those made by the company's engineer, and that in some instances he had relied upon their figures as to total yards of earth removed, and, in fact, had consulted their maps and measurements in arriving at some of them. We think in view of the proceedings had upon the trial and the conduct of the plaintiffs and their engineer, that the appellant was justified in relying on its total estimates as made by its engineers and in combatting only the attempt of the plaintiff to have a reclassification of the material that the company's figures showed had been removed. In view of this situation, we think the judgment ought to be modified to the extent of the excess shown in these total estimates over those shown by the appellant's engineer. The question therefore arises as to the classifications from which this deduction shall be made. As the principal contest was made over the change in classification of "hard-pan" from that of common material to loose rock, and since the principal change made by the court was in this classification, we think the most favorable presumption that could be indulged in favor of the appellant would be that the mistake had been made in increasing the total number of yards of the classification designated as loose rock for which the appellant was required to pay at the higher rate, namely, forty-five cents per cubic yard. We have, therefore, concluded to modify this judgment to the extent of the overcharge in total number of cubic yards admitted by respondent to be 3,162.2 yards, which, computed at forty-five cents per cubic yard, will entitle the appellant to a reduction and modification of the judgment in the sum of $1,423.

The sixth assignment of error is that so much of the mechanic's lien law of this state as allows attorney's fees to a

34  N. Bennett Co. *v.* Twin Falls L. etc. Co.  [14 Idaho,

Opinion of the Court—Ailshie, C. J.

lien claimant is unconstitutional, for the reason that it does not provide for an allowance to the adverse party in case he shall be successful. We had occasion to consider the validity and constitutionality of this statute in *Thompson v. Wise Boy Min. & Mill. Co.*, 9 Ida. 363, 74 Pac. 958, and there decided adversely to appellant's contention here. We are still satis- fied with the conclusion reached in that case as to the validity of this portion of the law and the right to recover attorney's fees in case of a successful prosecution of a lien and for that reason will not pursue that assignment of error further. In this case, however, the court allowed both Nelson Bennett Company and Toponce a total sum of $10,000 for attorney's fees, and appellant contends that this sum is excessive. The evidence submitted to the trial court upon which he found that this was a reasonable sum to be allowed was sufficient in our judgment to authorize and justify the court in such a finding and conclusion. We are not prepared to say that in a case of the magnitude of this and of the peculiar character of the contract under which the plaintiff was operating and the nature of the work and the obstacles which he met in attempting to recover under the contract and the obsti- nacy with which this case has been contested, $10,000 is an excessive *sum to be allowed as attorney's fees.*

Numerous errors have been assigned against the rulings of the court in the admission and rejection of evidence. The particular objection to the ruling in each instance has not been pointed out by brief, nor have they been separately con- sidered therein. Upon an examination of them, however, we are satisfied that the rulings of the court have generally been correct—in some instances perhaps erroneous; but it is clear to us that the appellant has not been injured or prejudiced thereby. This was an equity case and no question of fact, was submitted to a jury, and in such cases the rule as to the admission of evidence is much more liberal, and the appel- late court will hesitate to reverse a judgment on account of an erroneous ruling in the admission of evidence unless it ap- pears that the court was proceeding on a wrong theory of the case, or that the admission or rejection of the evidence offered

misled the losing party or surprised him and in some way deprived him of some right or embarrassed him in the presentation of some substantial part of his cause of action or grounds of defense.

After the entry of judgment the plaintiffs filed a cost-bill in which they claimed costs to the amount of $2,488.60. The defendant Twin Falls Land & Water Company made a motion to retax costs and supported the same by affidavit, and the two principal objections appear to have been: First, that mileage and *per diem* had been allowed to a number of subcontractors, who, while not parties to the action, were really interested in the outcome of the case, and were therefore such interested parties as were not entitled to *per diem* and mileage for attendance as witnesses; and, second, that mileage had been claimed for attendance of witnesses a distance of more than thirty miles. The court denied the motion, and the appellant assigns the same as error. The action of the court in denying the motion was clearly within the purview of the law as announced by this court in *Anderson v. Ferguson-Bach Sheep Company*, 12 Ida. 418, 86 Pac. 41.

We are satisfied that there is no error in this record that has been called to our attention that would justify us in a reversal of the judgment herein. It is the order of this court that the judgment be modified and reduced in the sum of $1,423, and that as so modified and reduced it be and is hereby in all other respects affirmed. Each party will pay its own costs incurred on this appeal. The case is remanded, with direction that the judgment be modified as above indicated.

Sullivan, J., and Stewart, J., concur.

(January 30, 1908.)

ON PETITION FOR REHEARING.

PER CURIAM.—A petition for a rehearing has been filed in this case, and upon an examination of it, the court was at first disposed to strike it from the files on account of the disrespectful and discourteous language in which it was couched. However, since it was filed, the resident attorney has with-

drawn from the petition and the court is satisfied that he took no part in the preparation of the same. On further consideration, the court concluded to and has made a careful examination of the questions raised by the petition, and we will proceed seriatim to consider them.

Counsel for petitioner raises six questions in his petition, all of which have been considered in the former hearing of this case, except one, and that is the first question suggested by the petition to the effect that the respondent, the Nelson Bennett Co., showed no legal right to recover in this action and that it affirmatively appears that it has no right to recover by reason of the fact that it had not complied with the requirements of the statutes of Idaho as to foreign corporations.

The trial court in its first finding of fact found that the Nelson Bennett Co. was an incorporation duly organized and existing under and by virtue of the laws of the state of Washington, and during all of the times mentioned in the complaint had carried on business as a contractor, in its corporate name, in Cassia county, state of Idaho, and at all of said times had accepted the provisions of the constitution and complied with the laws of the state of Idaho relative to nonresident corporations doing business within this state.   In support of this contention, counsel calls our attention to folio 707 of the transcript, wherein it is made to appear, on the trial of the case, the respondent's counsel offered in evidence a certificate executed by the Secretary of State, dated December 1, 1904, reciting the fact that the articles of the incorporation of the Nelson Bennett Co. were filed August 1st, 1904, and marked "Plaintiff's Exhibit 11," which was received in evidence. It also appears in the transcript that counsel for respondent offered in evidence a certified copy of the written designation of agent by the Nelson Bennett Co., from the county recorder of Cassia county, which certificate was marked "Plaintiff's Exhibit 21" and received in evidence. Those exhibits with others introduced on the trial of the case were brought to this court by stipulation of counsel for inspection, and many of them not printed in the tran-

script. On an examination of said exhibit 11, we find that the Secretary of State of the state of Idaho certifies that the Nelson Bennett Co. filed in his office on the 1st day of August, 1903 (not 1904, as stated in the transcript), a properly authenticated copy of its articles of incorporation. It also appears from Plaintiff's Exhibit 21 that the Nelson Bennett Co. had filed its written designation of agent upon whom process could be served, with the county recorder of Cassia county as early as June 22, 1903. This evidence was amply sufficient to sustain the finding of the trial court to the effect that said respondent corporation had complied with the constitution and laws of this state in regard to foreign corporations doing business in this state.

Said exhibit 11 shows that a mistake was made in the transcript at folio 707, where it recites that the certificate of the Secretary of State shows that the articles of incorporation of the Nelson Bennett Co. were filed in the office of the Secretary of State on August 1, 1904, when, as a matter of fact, said certificate shows that said articles were filed August 1, 1903.

Another complete answer to this contention is that the court by its first finding of fact found that the Nelson Bennett Co. was a foreign corporation, ''and at all said times had accepted of the constitution and complied with the laws of the state of Idaho relative to nonresident corporations doing business within this state.'' That finding was not excepted to and there is no assignment of error in the record specifying in any manner that said finding is not supported by the evidence. Under the practice of this court, it will review no decision or ruling of the trial court unless the same is assigned as error. And under the rules of this court, the brief of appellant must contain a distinct enumeration of all errors relied upon by the appellant. The record contains no exception to said finding of the court, and appellant's brief contains no suggestion that that finding of the court is not supported by the evidence. It is too late to assign that finding of fact as an error and present it for the first time on a petition for a rehearing.

Another answer to this contention of petitioner is that the Nelson Bennett corporation alleged in its complaint that it had complied with the requirements of the constitution and statutes of this state in regard to filing its articles of incorporation and designating an agent upon whom service of process could be made, and the appellant in its answer denied that allegation on information and belief. That denial on information and belief is no denial of the allegations of the complaint above referred to; hence that allegation is admitted. The fact whether the respondent corporation had complied with the constitution and laws of this state in regard to filing its articles of incorporation and designating an agent upon whom process could be served could have been ascertained by the appellant from the records of the office of Secretary of State and of the auditor of the county where the principal business of the corporation was carried on, as the law requires them to be made matters of record there, and its denial of that fact upon information and belief is not sufficient and is no denial whatever.

Under the provisions of sec. 4183, Rev. Stat., if a defendant has no information and belief upon the subject sufficient to enable him to answer an allegation of the complaint, he may so state in the answer and place his denial on that ground, but this does not authorize a defendant to make a denial on information and belief when the truth of the fact alleged is a matter of public record and within his reach. This court has held in *Simpson v. Remington*, 6 Ida. 681, 59 Pac. 360, that a denial on information and belief is not permitted "where by a mere inspection of a public record the defendant may have obtained the knowledge as to whether an execution had been issued and returned." This court again said, in *Work Bros. v. Kinney*, 7 Ida. 460, 63 Pac. 596, when considering such denials, that "This is not good pleading, and such denials of matters of record within reach of the defendants. are insufficient."

We shall consider the second and third contentions as one, as they refer to the same stipulation in the contract on which this action was brought.

It is contended that this court has erroneously construed the provisions of the written contract, which provide that the estimates of the engineer should not estop the company from annulling the other provision, making his decision final and conclusive between the parties. This court in effect held that a stipulation in a contract requiring the submission of differences and controversies arising thereunder to the chief engineer of one of the contracting parties as umpire, and leaving the measures, estimates and classification of the work to him, and providing that his measurements and classifications shall not estop the party employing the engineer from disputing or questioning them, will not be enforced by the courts as a binding obligation against the other party to the contract. We still adhere to that rule. The contract provides as follows:

"Said second party shall not be estopped by any estimate made by its engineer from showing at any time the true and correct amount and character of the work which shall have been done and materials which shall have been furnished by said first party, or by any person under this agreement."

There the contract expressly provides that the second party shall not be bound by the estimates of its engineer of the amount and character of the work. We take it that that applies to all estimates of the several varieties of material required to be excavated and removed and classification of the same. So far as the umpire is concerned, his decision is made binding upon the first party and not binding upon the second, and for that reason the courts of this state will not enforce such a one-sided provision.

Counsel cites in support of his contention the case of *Mundy v. Louisville etc. R. R.,* 67 Fed. 635, 14 C. C. A. 583. That case involved a contract for the construction of a railroad, and contained a provision to the effect that in computing the final estimate and giving his final certificate, the engineer should not be bound by any preceding estimates and certificates, but that such preceding estimates and certificates should be held to be only approximate to the final estimate. That is a very different provision from the one under consid-

eration.   That authorizes the engineer to correct his first estimates in his final estimate, but it did not relieve the second party from the decision of the engineer as made by his final estimates, as does the contract under consideration.   The estimate of the chief engineer under the provisions of the contract involved in this case does not bind, and was not intended to bind, the second party, and for that reason the contract in the case at bar is not similar in that regard to the one in the Mundy case above cited.

It is also contended that this court has expressly found that the lower court was authorized to go behind the stipulation of the contract as to the finality of the chief engineer's decision, and thus sets aside the contract for constructive fraud of the chief engineer, and that the court lays down a new rule of law in that regard.   Counsel seems to misapprehend, or does not desire to understand, the decision in that regard.   In support of this contention, counsel quotes as follows from the opinion:

"The decision of the questions which arise and require the exercise of a judgment of a *quasi*-judicial character cannot be delegated by the chief engineer or umpire to anyone.   The parties in this case have agreed to abide by the deliberate and fair judgment of the 'chief engineer.'   In order for him to fairly, honestly and justly exercise that judgment, it was necessary for him to hear the facts and to take such steps as would enable him to come into possession of the facts in controversy or on which his judgment and decision depended.   Such was not done."

Counsel says that he does not propose that the implications which arise therefrom shall go unchallenged.   The quoted portion of the opinion fairly expresses the views of this court upon the point there under consideration.   The record clearly shows that the chief engineer took the estimates and classifications from his subordinates.   He knew that his subordinate, Shobert, was very much prejudiced against Mr. Bennett and threatened to "do him."   Mr. Bennett informed Mr. Bickel of this fact and requested him to place some other engineer who was not prejudiced against him in

charge of his work.   Mr. Bickel's reply indicated that Mr.
Shobert was just the kind of a man he wanted as a subordin-
ate, and Mr. Bickel exhibited, as we gather from the record,
such arbitrary and wanton disregard of the Nelson Bennett
Co.'s rights as to be equivalent to fraud.   This court has held
that in order for the chief engineer to honestly and justly
exercise his judgment in regard to the matter in controversy,
it was necessary for him to hear the facts and to take such
steps as would enable him to come into possession of the facts
in controversy, and that he had not done so.   We think the
record fully justifies the conclusion the court reached on that
point.

In this connection it is contended in the third specifica-
tion that this "court has abrogated the stipulation of the con-
tract, making the decision of the engineer final, not because
of any actual or positive fraud or dishonesty, bias or preju-
dice, but for mistakes of policy, or constructive fraud, there-
by declaring a new rule of law, heretofore unheard of."   The
court has done nothing of the kind, and no such construction
can reasonably be drawn from the opinion.   The trial court
found as follows:

"That the said chief engineer wrongfully, arbitrarily and
without having made proper examinations, inspections and
tests, and without having made proper observations, and
without sufficient knowledge upon which to found a just judg-
ment in respect to the kind, quality and classification of ma-
terials, and in violation of good faith and duty, did make,
cause to be made and permit untrue and grossly erroneous
estimates and classifications of the kind, character and amount
of materials removed and placed, and work done, by said
plaintiff.   The said chief engineer, in arriving at his conclu-
sions, based his judgment almost entirely upon reports made
to him by his subordinates, and without any due or proper ex-
amination made by him to verify these reports.   That the
reports of the subordinates were grossly incorrect and un-
true."

If that finding of the trial court is not sufficiently strong
to satisfy counsel that the court found the chief engineer ex-

hibited such an arbitrary and wanton disregard of respondent's plain rights under the contract as to be equivalent to fraud, or had committed errors and mistakes to the respondent's prejudice, so gross and palpable as to leave no doubt in the mind of the court that grave injustice had been done to the respondent, it must require very strong language to satisfy him. In effect the trial court found that said engineer was guilty of fraud, although the word "fraud" was not used in that finding. The words, "wrongfully," "arbitrarily," "without sufficient knowledge," "in violation of good faith," "untrue," "grossly erroneous," "grossly incorrect," and "untrue" are used in said finding. If that finding only finds that said engineer was moved by "mistakes of policy" only, and not by fraud, as suggested by counsel, then we do not understand the language used therein.

The contract considered in *Mundy v. Louisville etc. R. R. Co., supra,* expressly stipulated that the decision of the engineer should not be conclusive in case of "fraud or mistake." But the court there held that the stipulation in the contract, to wit, that the engineer's decision should not be conclusive in cases of fraud or mistake, did not vary the construction of the contract; that in such a contract, the exception therefrom of fraud or mistake would be implied if they were not expressed in the contract; that that exception in such contract is always implied whether it is written in the contract or not. We think that the correct rule. That the provision is not contained in the contract under consideration, but it is clearly implied therein, and the contract will be construed the same as though it were written in the contract.

The court has not desired to reflect on the integrity of any person, as insinuated by counsel for the petitioner, but is controlled solely by the facts as they appear in the records before us. Counsel, with some asperity, has deemed it wise to suggest in his petition for a rehearing that the standing of the engineers referred to, for fairness and honesty, will continue to be of the best, regardless of the decision of this court. So far as this decision is concerned, it is immaterial

to us what their standing ever has been or continues to be. We have been called upon to decide this case upon the record, regardless of the standing of any of the persons named therein, and if their candor and fairness is impeached by evidence in the record, we are not responsible for that.

It is next contended that the court misapprehended the proof in respect to certain items of work in the "hard-pan," and for that reason failed to reduce the judgment as it ought to have been. We have gone through the evidence and carefully considered the extensive quotations therefrom contained in the petition, and we are fully convinced that the conclusion reached by the court is correct and should be sustained. The controversy arises mostly from the classification of the hard-pan. While it is true the evidence shows that much of said hard-pan was plowed with a ten-inch plow and six horses, it is also true that the evidence shows that in plowing with six horses and a ten-inch plow, the plow was so set as to cut but six or eight inches in width, and, under the contract, all hard-pan or all earth that could not be successfully plowed with a ten-inch plow and six horses was to be classified as "loose rock," and simply because many of the contractors did, as they testified, "wear the hard-pan out" with a ten-inch plow and six horses, the record does not show that they could successfully plow it with six horses and a ten-inch plow. There is nothing in this contention.

It is next contended that the court is mistaken as to the state of the proof as to the total quantity of material removed, and upon the uncontested facts the judgment should be further reduced. It was alleged in the complaint that there had been placed 184,551 cubic yards of embankment in the Dry creek dam, and the answer admitted that there had been placed there 176,073 yards. It was contended that respondent should be paid for only 160,273 cubic yards thereof, that being "within the lines of the stakes and directions given by defendant's engineer," and it is averred that respondent was to put a two-foot excess on the sides and top of the dam without pay. It was admitted that there was more material actually placed on the Dry creek dam than was included in the

44   N. Bennett Co. *v.* Twin Falls L. etc. Co.   [14 Idaho,

Opinion of the Court, on Rehearing.

measurements of the company's engineer, and it appears that said excess amounted to something over 20,000 yards. It is clear from the record that there was a dispute in regard to the quantity of material placed in the Dry creek dam, and the court found that there were 208,992 cubic yards placed therein, and that the appellant allowed respondent for only 160,273 cubic yards placed therein. Counsel for appellant admits on page 106 of his brief that respondent never admitted that the total measurements of the chief engineer of the Dry creek dam were correct. The transcript and the briefs of counsel clearly show that there was a contest over the amount of material placed in said dam. After again going over the matter, we are satisfied that our former decision herein is correct. So far as the classification of the material is concerned, we are satisfied with the conclusion reached in our original decision.

The next question raised by the petition is an allowance of $1,008 for "bond-plowing" on the main canal. There is nothing whatever in the contract or specifications requiring "bond-plowing." In the specifications for the Dry creek dam, which were handed the respondent sometime after he had commenced work on his contract, was a specification for "bond-plowing" and it is as follows: "The surface will then be thoroughly plowed, first, in a direction parallel with the stream-bed, and the second time, parallel with the axis of the dam, throwing up ridges and making deep furrows between." There is no requirement in the contract or specifications for "bond-plowing" anywhere on said canal, except as above set forth, and that applies only to the Dry creek dam.

It is contended that as respondent agreed to construct the banks of the canal in a good, workmanlike manner out of materials excavated out of the prism of the canal, making the embankment as near water-tight as possible of suitable materials to be judged by the engineer and in accordance with his instructions, respondent was required to do certain "bond-plowing," and that in order to do said work in a workmanlike manner, "bond-plowing" must be done. It was held by the

trial court that under those provisions of the contract, "bond-plowing" was not required to be done; or, if done, under the orders of the engineer, a reasonable compensation should be paid therefor. We think that ruling of the court is correct, and that under the terms of said contract, wherever the respondent did "bond-plowing" under the orders of the chief engineer, he was entitled to receive compensation therefor.

We find no merit in the petition. A rehearing is denied.